UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JUAN FORTUNA,

                             Plaintiff,

               -against-

ANDREW M. SAUL,
Commissioner of Social Security,

                            Defendant.
-------------------------------------------------------------X

**OPINION AND ORDER**

19 Civ. 11066 (JCM)

      Plaintiff Juan Fortuna ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g), challenging the decision of the Defendant Commissioner of Social Security ("the Commissioner"), which denied Plaintiff's application for disability insurance benefits, finding him not disabled within the meaning of the Social Security Act. (Docket No. 1).  Presently before this Court are (1) Plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 29), and (2) the Commissioner's cross-motion for judgment on the pleadings, (Docket No. 31).[1]  For the reasons set forth herein, Plaintiff's motion is granted in part and denied in part, the Commissioner's cross-motion is granted in part and denied in part, and this case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion & Order.

---

[1] This action is before the Court for all purposes on consent of the parties, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket No. 22).

## I.  BACKGROUND

Plaintiff was born in 1973. (R.[2] 186).  He filed an application for disability insurance benefits on April 1, 2016, alleging that he became disabled on January 29, 2013. (R. 186). Plaintiff's application was initially denied on June 8, 2016, (R. 63-73), after which he requested a hearing, (R. 88-89), which was held on July 30, 2018, (R. 34-62).  Administrative Law Judge ("ALJ") LaSandra Morrison issued a decision on October 3, 2018, denying Plaintiff's claim. (R. 18-28).  Plaintiff requested review by the Appeals Council, which denied the request on October 1, 2019, (R. 1-5), making the ALJ's decision ripe for review.

### A.  Medical Evidence

As summarized below, the administrative record reflects treatment for various physical impairments that Plaintiff received from multiple sources.

### 1.  Evidence Regarding Impairments Stemming from Work Accident

### i.  New York-Presbyterian Hospital

On January 29, 2013, Plaintiff was treated in the emergency room of New York-Presbyterian Hospital ("New York-Presbyterian") for an amputation to his right little finger. (R. 999-1000).  The attending physician, Dr. Matthew O'Neill, prescribed Percocet for Plaintiff's pain. (R. 1000).  Plaintiff was discharged with instructions to return to the "Hand clinic" within one week and resume work within five days. (R. 1000-02).

### ii.  CitiMedical I, PLLC

Between February 5, 2013 and December 3, 2015, Plaintiff saw Dr. Regina Moshe at CitiMedical I, PLLC ("CitiMedical") for pain in his amputated finger, right shoulder pain and neck pain. (R. 868-78, 927-28).  At his initial appointment, he reported that his finger was

---

[2] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social security benefits, filed on March 13, 2020. (Docket Nos. 24, 24-1–24-17).

amputated on January 29, 2013 when it got crushed and stuck between a door and a garbage can he was carrying at his demolition job. (R. 868). He complained of constant, throbbing pain in the finger at a scale of "9/10" and intermittent, sharp pain in his right shoulder at a scale of "6/10." (R. 870). He also presented with numbness and tingling in his right upper extremity, swelling in his right hand, and stiffness in his right hand and shoulder. (R. 869-70). The pain was exacerbated by lifting, carrying heavy objects and lying down. (R. 870).

On examination, Plaintiff was in "moderate distress." (R. 872). Plaintiff's right shoulder exhibited a reduced range of motion, with flexion, extension and abduction at 125 degrees, adduction at 15 degrees, internal rotation at 20 degrees, and external rotation at 60 degrees. (R. 873).[3] Plaintiff experienced "moderate" pain on the shoulder's palpation and demonstrated impingement, but it did not demonstrate crepitus or apprehension. (*Id.*). A drop arm test was negative. (*Id.*). In addition, the stitches around Plaintiff's amputated finger were moderately swollen and demonstrated erythema. (R. 874). However, Plaintiff exhibited a normal gait and walked independently. (R. 874-75). Dr. Moshe diagnosed a crush injury and amputation in the right little finger's distal phalynx, a right hand "sprain/straight," and a right shoulder "sprain/strain." (R. 870, 876). She identified a "100%" temporary impairment, asserting that Plaintiff's complaints were "consistent with . . . the history of th[e] injury" as well as "objective findings," and that Plaintiff was unable to return to work. (R. 876-77). Her prognosis was guarded. (R. 876). She referred Plaintiff to a hand surgeon, recommended physical therapy, and ordered an MRI of his right shoulder. (R. 877).

Thereafter, Plaintiff saw Dr. Moshe monthly, reporting increasing pain in his right shoulder, further pain in his amputated finger as the wound healed, and neck pain. (*E.g.*, R. 548-

---

[3] Dr. Moshe indicated that a normal shoulder range of motion includes flexion, extension and abduction at 150 degrees, adduction at 30 degrees, internal rotation at 40 degrees, and external rotation at 90 degrees. (*Id.*).

625, 628-61, 683-89, 751-57, 759-75, 777-812, 815-21, 823-43, 880-87, 903-09, 911-17, 920-28).   At all of these appointments, Dr. Moshe found Plaintiff unable to work. (*Id.*).   Plaintiff also began acupuncture and physical therapy for his neck, right elbow, right shoulder, and right arm pain, which lasted until June 2015. (R. 294-306, 352-515, 528-46, 930-31, 1005).

On February 21, 2013, an MRI at Nexray Medical Imaging, P.C. showed no displaced fracture or inflammatory process in Plaintiff's right shoulder. (R. 350).   However, Dr. William Weiner, a radiologist, assessed a subscapularis strain and tear of the rotator cuff complex, impingement of the supraspinatus tendon and muscle from the acromioclavicular joint, and fluid and some uplifting at the posterior labrum consistent with a partial tear. (*Id.*).

On March 19, 2013, Dr. Moshe added the right shoulder tear to Plaintiff's list of diagnoses. (R. 754-55).   Over the next three months, Plaintiff reported "constant" pain in his shoulder as high as "8/10," even though its range of motion slightly improved and his amputated finger was "healing well." (R. 647-49, 630-32, 683-87, 751).   On April 2, 2013, Plaintiff saw orthopedic surgeon Dr. Randall Ehrlich for right shoulder pain. (R. 714-16).   On examination, Plaintiff exhibited a reduced range of motion in his right shoulder "limited by pain and spasm," but full range of motion in his elbow, wrist and digits. (R. 715).   Dr. Ehrlich noted evidence of splinting, guarding and tenderness to palpation at the anterolateral acromion as well as lateral acromial margin, but no deformity or tenderness in the bicipital groove or acromioclavicular joint. (*Id.*).   Although he observed normal motor and sensory function in the medial, radial, ulnar, musculocutaneous and axillary nerves, Dr. Ehrlich assigned a guarded prognosis. (*Id.*).   He assessed a symptomatic traumatic internal derangement causing an unspecified disorder of the bursae and tendon in the right shoulder region, as well as a rotator cuff sprain. (*See* R. 715-16).[4]

---

[4] The relevant portion of Dr. Ehrlich's note lists this condition on Plaintiff's left shoulder, but this appears to be a typographical error. (*Id.*).

He opined that Plaintiff had a seventy-five percent marked, partial and temporary impairment that prevented him from performing his job, but that Plaintiff had a "[s]edentary exertional capacity." (*Id.*).  Dr. Ehrlich prescribed further physical therapy specifically focused on his right shoulder. (R. 716).  He also discussed a subacromial corticosteroid injection and arthroscopic intervention as further treatment options. (*Id.*).

On July 18, 2013, Plaintiff told Dr. Moshe that physical therapy temporarily alleviated his discomfort, and that his right shoulder pain fluctuated with weather changes. (R. 548).  He also stated that he was unable to lift ten to fifteen pounds. (*Id.*).  He still experienced intermittent throbbing pain at a "6/10" in his amputated finger, which exhibited tenderness to palpation. (R. 548, 550).  On examination, his right shoulder exhibited flexion, extension and abduction at 135 degrees, adduction at 20 degrees, unchanged internal rotation and external rotation at 70 degrees. (R. 550).

On August 22, 2013, Plaintiff complained of shoulder pain as high as "9/10." (R. 639).  Dr. Moshe opined that Plaintiff's amputated finger would "likely need surgery . . . as well" as his right shoulder due to its continued intermittent, throbbing pain at "7/10." (*Id.*).  The finger was still mildly swollen and exhibited a nail remnant. (R. 641).  She also observed tenderness to palpation along Plaintiff's right trapezius muscle and decreased range of motion of his neck to the right. (*Id.*).  On September 26, 2013, after noting comparable complaints in addition to pain at a scale of "8/10" in Plaintiff's neck, Dr. Moshe conducted a cervical spine examination. (R. 586-88).  She observed flexion at 50 degrees, extension at 40 degrees, left rotation at 60 degrees, right rotation at 40 degrees, and left and right lateral flexion at 30 degrees. (R. 588).[5]  Consistent

---

[5] Dr. Moshe noted that a normal range of motion in the cervical spine typically involves flexion at 60 degrees, extension at 50 degrees, left and right rotation at 80 degrees, and left and right lateral flexion at 40 degrees. (*Id.*).

with an MRI of Plaintiff's cervical spine from the previous month,[6] Dr. Moshe diagnosed a cervical spine "sprain/strain" and cervical disc displacement in addition to Plaintiff's other ailments. (R. 589-90).

Plaintiff received an ablation on his right fifth fingernail on October 17, 2013 for a "significant" nail plate deformity by Dr. I. Roger Carlis. (R. 2017-18). On November 21, 2013, Plaintiff reported neck pain at "10/10" as well as continued shoulder and finger pain at "7/10," and presented to Dr. Moshe with reduced ranges of motion in his right shoulder and cervical spine. (R. 557-58). Over the next several months, Plaintiff reported decreased pain in his finger at a scale of "3/10" to "4/10," though continued pain as high as "9/10" in his neck and "8/10" in his right shoulder. (R. 565-66, 806-07, 815-16, 837-38, 881, 903-05).

On February 25, 2014, Dr. Mark McMahon performed a right shoulder manipulation, arthroscopy, debridement of the subscapularis tendon and labrum, partial synovectomy, debridement of fibrotic material, and injection of Marcaine. (R. 676, 696-97). On April 25, 2014, Plaintiff saw Dr. Aron Rovner with regard to his ongoing right shoulder and neck pain. (R. 851). Dr. Rovner opined that based on an undated MRI, Plaintiff had multiple herniated discs "but no cord compression" or "significant impingement." (*Id.*). He recommended a trial of epidural steroid injections. (*Id.*). The next day, Plaintiff was evaluated by Dr. Robert Marini, a physiatrist, regarding the same issues. (R. 516). On examination, Plaintiff's cervical spine revealed no atrophy but limited range of motion[7] and "appreciable tenderness" along the

---

[6] The MRI, taken on August 14, 2013, demonstrated no fracture, spondylolisthesis, marrow replacement process, intrathecal mass, or spinal cord abnormalities. (R. 2014). However, Dr. Daniel Beyda, a radiologist, assessed straightening of cervical lordosis and post-traumatic muscle spasm, based on a posterolateral disc herniation, a broad-based disc bulge, and a right paracentral disc herniation that indented the ventral thecal sac. (*Id.*).

[7] Plaintiff's cervical spine exhibited extension at 40 degrees, right lateral rotation at 40 degrees, and left lateral rotation at 45 degrees. (*Id.*).

posterior trapezius muscle. (*Id.*).  Dr. Marini also observed decompression signs on Plaintiff's

right side, sensory changes along the volar aspect of the right upper extremity, and Spurling

signs as well as pain on palpation to the right shoulder. (*Id.*).  Plaintiff's right shoulder also

exhibited "diminished" range of motion and internal rotation. (*Id.*).[8]  Further, he found

"diminished grasp" strength in Plaintiff's right hand "compared to the left." (R. 516-17).  Dr.

Marini diagnosed cervical derangement, a right rotator cuff tear status post arthroscopic surgery

and a right fifth finger distal amputation with neuroma excision. (R. 517).  Based on nerve

conduction velocity ("NCV") and electromyography ("EMG") studies, he also detected bilateral

carpal tunnel syndrome "affecting sensory and motor components," bilateral sensory ulnar nerve

neuropathy at the wrist, and C6/C7 radiculopathy on Plaintiff's right upper extremity. (*See* R.

517-18).  He recommended that Plaintiff continue with physical therapy. (R. 517).

On April 28, 2014, Dr. Mikhail Solomonov conducted an initial pain management

evaluation for "severe" right-sided neck pain. (R. 679).  Plaintiff explained that although his

right shoulder pain was "improv[ing]" after his surgery, his neck pain was "persistent,"

"throbbing," and "constant," causing further radiating pain in his right shoulder and arm. (*Id.*).

According to Plaintiff, the pain worsened with extension and turning to the right, and interfered

with his activities of daily living as well as sleep. (*Id.*).  He presented a "moderate degree of

distress" at the examination, grimacing when turning his head. (R. 680).  A cervical spine

examination revealed forward flexion at 40 degrees, extension at 20 degrees, left rotation at 80

degrees, right rotation at 60 degrees, left lateral flexion at 40 degrees, and right lateral flexion at

---

[8] The shoulder's forward flexion was 165 degrees and abduction was 110 degrees. (*Id.*).

20 degrees. (R. 680-81).[9]  Dr. Solomonov found that an MRI from April 14, 2013 revealed disc herniation at the C3/C4 and C6/C7 levels, and a disc bulge at the C5/C6 levels. (R. 681).  He also observed an antalgic component with motion in Plaintiff's right shoulder, and symmetrically decreased reflexes in the brachioradialis, biceps and triceps. (*Id.*).  He did not identify any effusion, deltoid atrophy or frank motor deficit in Plaintiff's upper extremities. (*Id.*).  He found the range of motion in Plaintiff's wrists, elbows and left shoulder functional, Plaintiff's grasping power intact, and his lumbar and thoracic spine normal. (*Id.*).  Dr. Solomonov diagnosed posttraumatic cervical facet arthropathy and disc displacement. (*Id.*).  He recommended a right "diagnostic/therapeutic medial branch block under fluoroscopic guidance" in the affected discs. (*Id.*).  He performed this procedure on June 25, 2014. (R. 626-27).

At a follow-up on June 30, 2014, Dr. Solomonov deemed the procedure unsuccessful, as Plaintiff reported that his pain came back the next day. (R. 628).  On examination, Plaintiff's cervical spine exhibited the same range of motion as in April. (*Id.*).  Therefore, Dr. Solomonov recommended cervical epidural steroid injections under fluoroscopic guidance, (R. 629), which Plaintiff received on July 9 and August 6, 2014, (R. 345, 547).

On July 16, 2014, Plaintiff advised Dr. Moshe that Dr. Solomonov's injections brought "mild relief," decreasing his right shoulder pain to "6.5/10," and that his amputated finger only bothered him when the tip brushed against a table. (R. 574-75).  His right shoulder demonstrated flexion and extension at 145 degrees, abduction at 140 degrees, and internal rotation at 30 degrees. (R. 576).  Although Plaintiff still reported neck pain at "9/10," (R. 574), at a further appointment with Dr. Solomonov on July 28, 2014, Plaintiff reported "50% improvement" in his

---

[9] Dr. Solomonov opined that normal cervical spine ranges of motion include forward flexion 60 degrees, extension at 50 degrees, left rotation at 80 degrees, right rotation at 80 degrees, left lateral flexion at 40 degrees, and right lateral flexion at 40 degrees. (*Id.*).

neck pain from the injections, (R. 624).  At that time, his cervical spine exhibited "limited range of motion . . . due to pain, splinting, and guarding," with forward flexion at 60 degrees, extension at 30 degrees, left rotation at 80 degrees, right rotation at 60 degrees, left lateral flexion at 40 degrees, and right lateral flexion at 20 degrees. (R. 624).  Although Dr. Solomonov noted positive Spurling signs on the right, he observed a functional range of motion in Plaintiff's shoulders. (*Id.*).  He opined that Plaintiff had developed right-sided neck pain with paresthesia in the right upper extremity, and recommended additional steroid injections. (R. 624-25).

For the rest of 2014, Plaintiff had monthly appointments with Dr. Urania Ng, a physiatrist, during which he consistently reported neck pain as high as "9/10," right shoulder pain as high as "8/10," and pain in his amputated finger at a range of "0" to "4/10" when he tried to make a fist or touch the amputation stump. (R. 719-29).  He explained that although Percocet, physical therapy and the neck injections provided "temporary relief," the pain in his neck returned a few days to two weeks after an injection. (R. 719, 725, 727, 729).  Moreover, in October, his physical therapy stopped due to his workers' compensation being "cut off" and his home exercise program was "limited" by his pain. (R. 725).  During this period, Plaintiff's cervical spine range of motion increased to extension at 50 degrees, but dropped to left and right rotation at 60 degrees, and left and lateral flexion at 30 degrees. (R. 719, 725-26, 729-30).  Dr. Ng observed an intact gait but tenderness to palpation of Plaintiff's anterior and lateral right shoulder, right lateral deltoids, and the amputation stump, as well as the cervical paraspinal muscles, upper trapezius muscles, with the worst pain on the right side. (R. 719-30).  On December 24, 2014, she also noted that Plaintiff was unable to fully flex his right fifth digit all the way, and Plaintiff stated that he could not lift ten pounds with his right arm. (R. 723-24).  Like his other physicians, Dr. Ng diagnosed a cervical sprain/strain, rotator cuff tear post

surgery, cervical disc displacement, and a right fifth digit distal amputation. (R. 724).  She recommended that Plaintiff resume physical therapy, continue taking Percocet as needed, and follow up with pain management and orthopedics. (R. 720, 724, 730).  She further determined that Plaintiff was "100%" "temporar[ily] impair[ed]" and Plaintiff could not work "because of persistent pain limiting his function." (R. 722, 724, 726, 728, 733).

On January 6, 2015, Plaintiff informed Dr. Moshe that his neck pain now caused headaches. (R. 610).  He had "trouble" with overhead activities, and noted that his neck pain was "worse" lately, especially when extending or bending it forward. (*Id.*).  He also could not sleep on his right side due to his shoulder pain, and noted intermittent throbbing pain in his right finger at a scale of "5/10." (*Id.*).  He was able to bathe and dress himself "slowly," but could not cook or clean. (*Id.*).  On examination, Dr. Moshe noted moderate tenderness and a muscle spasm in Plaintiff's upper trapezius and paraspinal muscles. (R. 611).  His cervical spine exhibited a somewhat decreased range of motion, with flexion at 50 degrees, extension at 40 degrees, right rotation at 40 degrees, left rotation at 60 degrees, and right and left rotation at 30 degrees. (*Id.*).  Dr. Moshe directed Plaintiff to see a spine specialist, continue physical therapy and continue taking Percocet. (R. 612).  She also advised that he avoid "any" overhead activities, lifting and carrying over five to ten pounds, and sudden neck movements.[10] (*Id.*).  On March 5, 2015, she diagnosed cervical radiculitis, and recommended that Plaintiff get another MRI of his neck. (R. 658-59).  However, at that appointment, Plaintiff did not report any finger pain. (R. 655).

For the rest of that year, Plaintiff continued to present with pain, numbness, and tingling in his neck, right shoulder and upper extremities, with the worst pain in his neck, as well as a

---

[10] Dr. Moshe reiterated this recommendation on February 5, 2015. (R. 799).

limited range of motion in those areas. (R. 759-61, 780-82, 803-04, 823-25).[11]  On July 21, 2015,

he stated that he sometimes had to pass objects from his right arm to his left arm because he

could not tolerate the pain from holding them, and was taking ibuprofen three times daily. (R.

803).  On September 24, 2015, Plaintiff complained that he was "going crazy" from his neck and

shoulder pain, which was "always there" unless he took ibuprofen four to six times per day. (R.

823).  He stated that he could lift "about 5-10 lbs with [the] right arm but not without

discomfort," and dressed and showered "with pain" such that he normally used his left arm for

these activities. (R. 824).  He still did not do household chores, but noted that he "t[ook] a bus to

the office." (*Id.*).  On examination, his rotator cuff strength was "4/5" on the right and his gait

was intact, but "slow." (R. 825-26).  Dr. Moshe recommended that he limit sudden neck

movements and unspecified "movements that would exacerbate neck pain," as well as avoid

lifting over ten pounds with the right arm and repetitive above-shoulder activities. (R. 829).

At Plaintiff's last appointment with Dr. Moshe on December 3, 2015, his neck pain was

"9/10" and his right shoulder pain was "6/10." (R. 927).  He also complained of hypersensitivity

and intermittent throbbing with a severity of "5/10" at the stump site of his amputated finger.

(*Id.*).[12]  Plaintiff advised that ibuprofen was not helping the pain. (*Id.*).  On examination, his

cervical spine exhibited flexion at 50 degrees, extension at 40 degrees, right and left rotation at

60 degrees, and lateral flexion at 30 degrees on both sides. (*Id.*).  His right shoulder exhibited

flexion at 135 degrees, extension at 30 degrees, abduction at 110 degrees, adduction at 40

---

[11] Although not observed at every appointment, his muscle spasms continued, and he repeatedly exhibited mild to moderate tenderness to palpation of the trapezius and paraspinal muscles. (R. 760, 781, 804, 824).

[12] The relevant treatment note states that the throbbing was in his right "middle" finger, but this appears to be a typographical error. (*Id.*).

degrees, internal rotation at 25 degrees, and external rotation at 35 degrees.  Dr. Moshe opined

that Plaintiff still could not return to work. (R. 928).

### iii. New York Spine Specialist

Dr. Andrew Cordiale at New York Spine Specialist also treated Plaintiff for neck and arm

pain between February and October 2015. (R. 331, 337).  During his initial consultation on

February 26, 2015, Plaintiff stated that his neck pain was "constant" and as severe as "10/10,"

causing radiation to his upper extremities on both sides with numbness, tingling and dysthesias.

(R. 337-38).  These symptoms worsened upon lifting, carrying, bending, moving around, lying

on his side and sleeping. (R. 338).  He also reported feeling "worse" after his previous cervical

injections. (R. 337).  On examination, Dr. Cordiale observed tenderness to palpation, "restricted

ranges of motion" and spasms in Plaintiff's cervical spine,[13] as well as abnormal motor skills and

reflexes in the upper extremities. (R. 338).  Plaintiff's motor strength was "4/5" in the right

deltoid, biceps, wrist extensors and flexors. (*Id.*).  His sensation was normal in all dermatones.

(R. 338-39).  Dr. Cordiale opined that an MRI taken in August 2013 demonstrated a bulge in

C5/C6, and herniated nucleus pulposus ("HNP") in C3/C4 and C6/C7. (R. 339).  He assessed a

cervical sprain, HNP with myelopathy, and cervical radiculopathy, directing Plaintiff to refrain

from heavy lifting, carrying or bending. (*Id.*).  Plaintiff elected to pursue chiropractic care,

physical therapy and further epidural injections rather than surgery for the time being. (*Id.*).

---

[13] Dr. Cordiale observed flexion at 35 degrees, extension at 25 degrees, and left and right "turning" at 40 degrees.
(*Id.*).  He opined that "normal" ranges include flexion at 70 degrees, extension at 45 degrees, and right and left
"turning" at 80 degrees. (*Id.*).

On March 24, 2015, Dr. Cordiale made similar observations[14] on examination and reviewed a new MRI taken on March 9.[15] (R. 334-36; *see also* R. 527).  He opined that the MRI showed HNP in C3/C4 as well as C5/C7, and a disc bulge in C4/5. (R. 336).  Dr. Cordiale recommended anterior cervical discectomy and fusion ("ACDF") surgery in C5 to C7. (*Id.*).  On May 5, 2015, after noting that Plaintiff's pain was "getting worse," (R. 327), Dr. Cordiale explained that this recommendation was based on Plaintiff's "failed conservative treatments" for over six months, the "failed epidural injections," neurological deficits in C/5 to C/7, the MRI's indication of HNP, and "severe" neck and arm pain at a "9/10," (R. 329).  On July 28, 2015, in addition to his previous findings, Dr. Cordiale observed "altered" sensation in C6 and C7 on the right side. (R. 340).  On October 27, 2015, Plaintiff expressed that he was in "constant, severe pain" and was "miserable." (R. 331).  Dr. Cordiale observed atrophy in the right forearm. (R. 332).  He requested workers' compensation coverage for the surgery and directed Plaintiff to continue avoiding heavy lifting, bending or carrying. (R. 333).

### iv.  New York Trades Council Queens Health Center

Rather than immediately moving forward with surgery, Plaintiff received further conservative treatment for his neck and right shoulder pain from various specialists at the New York Trades Council Queens Health Center ("Queens Health Center") for another year.  After noting his neck pain at a routine physical examination on December 17, 2015, (R. 1335),[16]

---

[14] In addition to observing similar examination results, Dr. Cordiale again directed Plaintiff to refrain from heavy lifting, carrying or bending. (R. 336).

[15] The March 9, 2015 MRI showed a central and right-sided disc herniation at C3/C4 impressing on the anterior thecal sac and narrowing of the right foramen; central subligamentous disc herniation at C5/C6 and C6/C7 impressing on the anterior thecal sac and narrowing of the neural foramina; disc bulging at C4/C5, which "moderately" impressed on the anterior thecal sac; and narrowing of the right neural foramen. (R. 527).

[16] At the examination, Plaintiff described "moderate" neck pain and "pressure feeling all the time." (*Id.*).  The Commissioner observes that the relevant treatment notes for this examination reflect normal right upper extremity strength and decreased right shoulder range of motion. (Docket No. 32 at 10; R. 1335).  However, it is unclear

Plaintiff visited Dr. Arthur Weiss, a neurologist, on January 12, 2016, (R. 1448). Dr. Weiss observed "moderate" cervical tenderness, cervical pain with acute head movements, right shoulder pain with right upper extremity muscle testing, decreased deep tendon reflexes in the upper extremities, and a "mildly decreased" right hand grip. (*Id.*). However, an upper extremity pinprick test was normal and Plaintiff's upper extremity power was "satisfactory." (*Id.*). Dr. Weiss diagnosed cervical radiculopathy, referred Plaintiff to a physiatrist, and recommended a further MRI if Plaintiff's symptoms did not improve with physical therapy. (*Id.*).

On January 15, 2016, Plaintiff presented to Dr. Fidel Rodriguez, a physiatrist. (R. 1486). The doctor noted tenderness in Plaintiff's trapezius muscles and reduced ranges of motion in his cervical spine, but negative Spurling tests, full grip strength on both sides and intact sensation. (*Id.*). He recommended physical therapy with a specific focus on the cervical spine, which Plaintiff had not yet received. (*Id.*). At a follow-up on March 18, 2016, Dr. Rodriguez ordered a further MRI to rule out progressive cervical discogenic disease. (R. 1485). He also prescribed Mobic and advised that Plaintiff stop taking "excessive" amounts of Motrin for his pain. (*Id.*).

Plaintiff commenced concurrent treatment by Dr. Sekhar Upadhyayula, a pain management specialist, on February 25, 2016. (R. 1962). The treatment notes indicate that Plaintiff was now working.[17] (*Id.*). Dr. Upadhyayula observed no obvious swelling or masses in his cervical spine and "[n]on[-][t]ender spinous processes," as well as normal sensation in the upper extremities, deep tendon reflexes and grip strength. (R. 1963-64). However, Plaintiff exhibited "symptomatic" flexion, extension and left rotation in his cervical spine, as well as a

whether these findings were based on a musculoskeletal examination or Plaintiff's own statements, as they appear in the "History" section of the notes and there is no such examination listed. (*See* R. 1335). The notes also document "good" range of motion in an unspecified area of the body in connection with Plaintiff taking ibuprofen, but again, it is unclear whether this observation is based on any objective medical testing or Plaintiff's own reports. (*See id.*).

[17] It is unclear whether this notation is an error, or what work Plaintiff was doing, as Plaintiff's earnings records do not reflect any work after his accident. (R. 194, 199).

14

"weakly positive" Spurling test for cervical radiculopathy on the right. (R. 1963).  Dr. Upadhyayula recommended three additional cervical epidural injections followed by further physical therapy. (R. 1964).  The doctor resolved to "increase the volume" and inject the medication "higher" in Plaintiff's cervical spine, to reach the C2/C3 level. (*Id.*).

On March 31, 2016, Dr. Upadhyayula observed a positive foraminal compression test and analyzed a recent MRI from earlier that month. (R. 1479).  The doctor opined that the MRI showed moderate cervical arthrosis with straightening of the cervical lordosis; midline herniations at C6 to C7, which lateralized toward the right epidural recess and with mass effect on the right nerve root; C4 to C5 bulging; and annulus lateralizing toward the right with slight indentation on the right nerve root in the recess. (R. 1480).  However, there was no evidence of cord compression or spinal stenosis. (*Id.*).  Dr. Upadhyayula further opined that "this [wa]s a challenging problem," as Plaintiff had been told he was a candidate for surgery but was no longer covered by workers' compensation and could not "go back" to his previous surgeon. (*See id.*).

At follow-up appointments in September and November 2016 after the cervical injections, Plaintiff's examination results were unchanged. (R. 2023-26).  Plaintiff reported that although the injections initially improved his pain by "50%," his symptoms returned such that his overall improvement was "0%." (R. 2023, 2025).

**v.  Dr. Sean McCance**

In light of Plaintiff's continued symptoms, Plaintiff sought treatment from Dr. Sean McCance, a spine surgeon, on September 7, 2016. (R. 2031).  His "constant" cervical spine pain now caused numbness and tingling in his right fingers and arm weakness. (*Id.*).  Plaintiff told Dr. McCance that his balance was "okay," but walking more than four to five blocks caused neck

pain. (*Id.*).  Similarly, Plaintiff could not stand for more than one-and-a-half to two hours, or sit

for more than two to three hours before experiencing discomfort. (*Id.*).  On examination, Plaintiff

exhibited pain upon left lateral motion of the cervical spine, decreased sensation in the right

biceps, medial forearm and fourth and fifth fingers, and limited strength in the right biceps and

triceps. (*Id.*).  Based on an MRI from March 2016, Dr. McCance diagnosed a C6 to C7 disc

herniation as well as chronic cervical pain. (R. 2031-32).  He noted that Plaintiff may be a

candidate for surgery. (R. 2032).

At a follow-up on November 1, 2016, Dr. McCance opined that a cervical spine X-ray

taken on September 19 showed a herniated disc at C3/C4. (R. 2035).  He observed further pain

upon forward flexion and extension, right lateral bending and right rotation of Plaintiff's cervical

spine, and decreased sensation in C5/C6 on the right. (*Id.*).  Dr. McCance also noted right

shoulder pain upon abduction of the right shoulder at 90 degrees and right rotator cuff weakness.

(*Id.*).  Unlike the previous appointment, Plaintiff exhibited normal motor strength in the upper

extremities. (*Id.*).  Nonetheless, Dr. McCance recommended a CT myelogram of Plaintiff's

cervical spine for further evaluation. (R. 2035-36).  The CT myelogram, performed on December

19, 2016, revealed moderate right osteophytic foraminal stenosis at C3/C4; a small right

proximal foraminal herniation truncating the root sleeve and moderate mid to distal left

osteophytic stenosis at C4/C5; a small right proximal foraminal herniation truncating the root

sleeve, congenitally narrowed foramina, and no uncal vertebral joint osteophyte at C5/C6; and a

diffuse disc bulge at C6/C7. (R. 2050).  The myelogram also demonstrated "slight straightening"

of the cervical curvature. (R. 2051).

A January 10, 2017 treatment note reflects that Plaintiff decided to move forward with

the recommended surgery due to "severe nerve compression" at numerous discs, causing

"chronic right arm pain with weakness and tingling into all five fingers of the hand and also posterior cervical pain and [chronic] right shoulder pain . . . [and] stiffness." (R. 2037).  Dr. McCance opined that despite Plaintiff's right shoulder surgery, the injury was "chronic" and still active, causing right shoulder and arm pain. (*See id.*).  Plaintiff advised that pain medications gave him only two to three hours of relief. (*Id.*).  A "[b]rief re-examination" in preparation for surgery the next day showed "painless cervical range of motion," "significant" weakness in the right triceps, decreased sensation in the right middle finger, and right wrist flexion at "4/5." (*Id.*).  Dr. McCance explained that the surgery would "primarily address [Plaintiff's] arm pain and . . . prevent progression of his neuropathy," but potentially would "not help his neck pain." (R. 2038).

On January 11, 2017, Dr. McCance successfully performed a right posterior laminoforaminotomy on discs C3/C4, C4/C5, C5/C6 and C6/C7, which revealed "multilevel severe foraminal stenosis." (R. 2052).  At a follow-up on January 13, 2017, Plaintiff reported that his arm was "feel[ing] better." (R. 2039).  When he returned on January 24, 2017, he advised feeling "40% better." (R. 2040).  Although he still experienced "some" posterior neck pain, the numbness and tingling in his right arm had decreased from "10/10" to "4/10." (*Id.*).  Similarly, Plaintiff still had "some" bilateral shoulder pain and right arm weakness, but his right arm felt "stronger" than it did before the surgery. (*Id.*).  Plaintiff advised that he could walk six to seven blocks and stand for only forty-five minutes to an hour, but that sitting did not cause any discomfort. (*Id.*).  On examination, he exhibited intact sensation in the upper extremities and full motor strength on both sides. (*Id.*).  Dr. McCance opined that Plaintiff was "recovering well" from the surgery. (*Id.*).

On March 10, 2017, Plaintiff stated that he was "60% better," with improved numbness in his arm but some right paracervical and trapezial pain, as well as continued "right shoulder issues." (R. 2042).  Plaintiff advised that he lacked restrictions walking, sitting or standing, and was able to sleep for six hours as opposed to three. (*Id.*).  On examination, Plaintiff's cervical incision had healed. (*Id.*).  He demonstrated a normal gait and ability to walk on his heels and toes. (*Id.*).  His upper extremity motor and neurological results were also normal. (*Id.*).  However, his cervical range of motion was "limited in all planes." (*Id.*).  Dr. McCance recommended that Plaintiff "avoid any excessive heavy lifting for the next month," but that he would be able to return to "most activities" thereafter. (*Id.*).

A further office note from August 9, 2017 describes Plaintiff as only "50% better," with continued complaints of posterior neck pain. (R. 2043).  Plaintiff denied any upper extremity numbness, paresthesias or weakness, but advised that standing and walking triggered neck pain such that he could only walk eight blocks and stand for sixty to ninety minutes.[18] (*Id.*).  On examination, however, Dr. McCance observed cervical range of motion "within functional limits in all planes." (*Id.*).  Plaintiff also reported that sitting was "fine." (*Id.*).  Despite Plaintiff's "mild neck pain," Dr. McCance advised him to return to "all normal activities." (*Id.*).

## 2.  Evidence Regarding Diabetes Mellitus

Both before and after the relevant period, Dr. Richard Hanover at Queens Health Center regularly treated Plaintiff for type II diabetes mellitus, noting that it was "not . . . uncontrolled" and "without . . . complication[s]." (*See generally* R. 1310-1402).  Plaintiff was prescribed

---

[18] Both the ALJ and the parties stated that Dr. McCance imposed a sixty-to-ninety minute standing restriction at this visit. (Docket Nos. 30 at 16, 32 at 13; R. 26).  However, the office note describes this limitation in the "History" section along with Plaintiff's complaints of pain, rather than in the "Assessment/Plan" section, which contains Dr. McCance's analysis and recommendations. (R. 2043).  This distinction suggests that Dr. McCance specifically did not incorporate any standing limitations into his instructions. (*See id.*).

18

Janumet and Glipizide for this condition. (*E.g.*, R. 1348). On January 23, 2015, Dr. Hanover

noted that Plaintiff's glycemic control was "suboptimal at 7.9," (R. 1355; *see also* 1348), but

thereafter, Dr. Hanover opined that Plaintiff lacked hypo or hyperglycemia symptoms, (R. 1342;

*see also* R. 1310, 1320, 1328, 1335). In March 2016, Plaintiff's glucose level was 131 mg/dL,

(R. 1221), compared to 215 mg/dL in February 2013, (R. 1389). Despite his fluctuating glucose

levels, Plaintiff was not hospitalized and did not receive any other significant treatment for his

diabetes.

**B. Opinion Evidence**

**1. Treating Physician Opinions**

**i. Mark McMahon, M.D.**

Between February 27, 2013 and March 10, 2014, Dr. McMahon, who performed

Plaintiff's right shoulder arthroscopic surgery, completed progress reports for Plaintiff's

workers' compensation claim based on periodic examinations. (R. 698-713). His initial progress

report, dated February 27, 2013, described a "crush injury" to Plaintiff's right amputated finger

as the primary diagnosis. (R. 710). At the examination, Plaintiff complained of stiffness in his

right shoulder and the doctor noted that the stump of Plaintiff's amputated finger was "not

healing well." (R. 710-12). Plaintiff could elevate his right shoulder to 90 degrees,

demonstrating an "abnormal" range of motion. (R. 712). Dr. McMahon opined that Plaintiff's

complaints were "consistent with [the] . . . history of the injury," that the "history of the injury . .

. [was] consistent with [his] objective findings," and that Plaintiff's was "100%" temporarily

impaired. (*Id.*). He referred Plaintiff to a hand surgeon for further treatment and concluded that

Plaintiff was unable to return to work. (R. 712-13).

The next several progress reports document continued right shoulder pain as well as the appearance of neck pain, noting disc herniations based on a cervical spine MRI and a continued limited range of motion in Plaintiff's shoulder. (R. 702-09).  On August 2, 2013, Dr. McMahon recommended right shoulder arthroscopy and referred Plaintiff to a spine specialist. (R. 709).  On January 30, 2014, Plaintiff complained of right elbow pain. (R. 701).

On March 10, 2014, Dr. McMahon changed Plaintiff's diagnosis from a crush injury to ankylosis of the joint/shoulder. (R. 698).  Dr. McMahon noted Plaintiff's ongoing right shoulder and neck pain, although Plaintiff could now elevate his shoulder to 100 degrees, and he did not complain of right hand or finger pain. (R. 699).  Dr. McMahon reiterated Plaintiff's "100% . . . temporary impairment" as well as complete inability to return to work. (*Id.*).

## ii. Sean McCance, M.D.

Dr. McCance completed a functional assessment of Plaintiff on January 24, 2017 opining that Plaintiff was "unable to work at this time" due to his right posterior cervical laminoforaminotomy on January 11, 2017. (R. 2021-22).  Dr. McCance stated that Plaintiff had been diagnosed with chronic multilevel cervical stenosis and right arm radiculopathy. (R. 2021). Plaintiff was unable to lift or carry any amount of weight, but was not limited in sitting or standing. (*Id.*).  Dr. McCance specified that Plaintiff could not perform postural activities such as climbing, bending, balancing, stooping, crouching, kneeling or crawling, or manipulative activities such as reaching, feeling/handling or pushing/pulling. (R. 2022).  Dr. McCance did not identify any environmental limitations. (*Id.*).

**2. Independent Medical Sources**

**i. Workers' Compensation Evaluations**

**(a) Alamgir Isani, M.D.**

Dr. Alamgir Isani submitted an independent opinion regarding Plaintiff's right finger, hand and wrist on June 11, 2013 in connection with his worker's compensation claim. (R. 969-72). Dr. Isani noted that Plaintiff's right small fingertip was injured on January 29, 2013 when it got caught between an 800 pound container and a door frame, which also caused a right shoulder sprain. (R. 969). Plaintiff attended physical therapy three times per week, but complained of "residual pain and soreness along the amputation stump" of the finger, as well as right shoulder pain. (R. 970).

On examination, Plaintiff exhibited no wrist or hand swelling or tenderness on either side, but residual tenderness in the area of the amputation closure. (R. 970-71). The amputation site lacked evidence of infection or neuroma, and the wound had healed. (R. 970). The amputated finger's range of motion was from 0 to 70 degrees with proximal interphalangeal joint ("PIP") flexion from 0 to 65 degrees, whereas his other fingers' metacarpophalangeal joint ("MP") flexion was 0 to 80 degrees, their PIP flexion was 0 to 90 degrees, and their distal interphalangeal joint ("DIP") flexion was 0 to 80 degrees. (R. 971). Dr. Isani observed normal sensibility in all right hand digits except for the amputated finger, and full range of motion in Plaintiff's wrists and forearms. (*Id.*). A radiograph showed an amputation of the right small finger at the base of the distal phalanx with a four millimeter basal remnant. (*Id.*). Dr. Isani diagnosed a right small finger amputation injury and opined that "surgical revision of the amputation stump needs to be considered with ablation of the nail plate to alleviate the pain [Plaintiff] [wa]s experiencing." (R. 971; *see also* R. 982). Dr. Isani further observed that

Plaintiff had a "mild disability of his right hand" caused by the accident, and could return to work that did not involve lifting more than thirty to forty pounds, but he also required orthopedic care for a rotator cuff tear in his shoulder. (R. 971-72).

In a further opinion dated January 23, 2014, Dr. Isani noted that Plaintiff underwent the recommended surgery on his amputated finger on October 17, 2013. (R. 951). Plaintiff had continued physical therapy since the last examination but was not on any medications for his hand. (R. 952). Plaintiff complained of "some soreness in the amputation stump," which Dr. Isani opined was connected to the "current cold weather." (*Id.*). He also complained of "some limitation of motion in the proximal interphalangeal joint" of the amputated finger, but primarily complained of right shoulder pain causing weakness in the right hand. (R. 952-53). Dr. Isani observed a "transverse healed scar" at the amputation stump without swelling or tenderness, and "good soft tissue padding covering the end of the bone." (R. 952). Since the last examination, the amputated finger's range of motion had increased to a range of 0 to 85 degrees. (*Id.*). However, the finger still lacked sensibility. (*Id.*). Plaintiff's right hand grip strength was 76 pounds, as opposed to 102 pounds on the left. (R. 953). A radiograph from that day's examination showed a disarticulation of the right small finger at the distal interphalangeal joint. (*Id.*). Dr. Isani diagnosed a revision of amputation to Plaintiff's right small finger in addition to his amputation injury. (*Id.*). He opined that Plaintiff had "obtained the maximum benefit of medical care" with regard to his finger injury, such that no further medical treatment, diagnostic testing or physical therapy was warranted. (*Id.*). He maintained that Plaintiff had a "mild partial disability of his right hand" due to the amputation, and could return to work that did not involve lifting thirty to forty pounds. (*Id.*).

In a final opinion dated October 27, 2014, Dr. Isani noted that Plaintiff had not been treated for his right small finger since August 25 that year. (R. 984).  Although the amputation site bothered him during cold weather, Dr. Isani opined that it had "healed in a satisfactory manner without any residual swelling, tenderness, or induration," or nail remnant. (R. 985).  Dr. Isani also did not observe any Tinel signs along the course of the digital nerves at the amputation site, or triggering of the right small finger. (*Id.*).  Moreover, the finger's MP range of motion had improved to 0 to 80 degrees, with PIP flexion from 0 to 90 degrees. (*Id.*).  Plaintiff's grip strength on the right had improved to ninety-eight pounds, versus ninety-six pounds on the left. (*Id.*).  Dr. Isani reiterated that Plaintiff had received maximum medical improvement with regard to his finger injury but that he had a 50% schedule loss of use ("SLU") of the finger. (R. 986).

**(b) Steven Zaretsky, M.D.**

Dr. Steven Zaretsky provided further evaluations of Plaintiff's injuries in connection with his workers' compensation claim on July 2 and November 5, 2014, as well as March 4, 2015. (R. 853, 922, 957, 992).  On July 2, 2014, Plaintiff rated his neck pain as a "9/10," noting that the pain radiated into his right lateral arm. (R. 855).  He also complained of occasional numbness in his right hand at night, weakness in his right arm, and nightly pain in his cervical spine. (*Id.*).  Plaintiff stated that his neck pain worsened with range of motion, pushing and pulling, but improved with medication, resting, lying down and gentle exercise. (R. 855-56).  Plaintiff experienced weakness and pain on a scale of "6/10" in his right shoulder girdle, caused by overhead activities and reaching behind his back, and which occasionally awakened him at night. (R. 856).  He could lift twenty pounds with his upper right extremity, whereas his left upper extremity could lift approximately forty to fifty pounds. (R. 855).  Plaintiff also complained of

23

pain on a scale of "3.5 to 4/10," at the amputation site of his right fifth finger, as well as weakened grip strength. (R. 856).

On examination, Plaintiff's gait was normal. (R. 857). He did not require assistive devices, help getting on and off of the exam table or assistance standing up. (*Id.*). Dr. Zaretsky observed "normal cervical lordosis," with no tenderness to palpation of Plaintiff's spinous processes, but mild tenderness to palpation of the paravertebral area. (*Id.*).[19] He also observed a "mild decrease in grip strength" but intact radial, ulnar and median nerves. (R. 858). Like Dr. Isani, Dr. Zaretksy opined that there was no need for further diagnostic studies of Plaintiff's right hand and it had reached maximum medical improvement. (*Id.*). Similarly, Plaintiff's shoulder had reached maximum medical improvement with active physical therapy, and Dr. Zaretsky recommended that he engage in a home exercise program. (*Id.*). He found that Plaintiff presented a "causally related moderate partial disability." (R. 983).

On November 5, 2014, Dr. Zaretsky noted that Plaintiff's right shoulder had improved fifteen to twenty percent and that he no longer received physical therapy for it. (R. 993). However, therapeutic injections to his cervical spine had brought only "short-term improvement." (*Id.*). Plaintiff rated his neck pain as an "8 to 9/10" and his right shoulder pain as an "8/10." (*Id.*). Although his right shoulder pain and weakness had not changed, his cervical spine experienced radiating pain, numbness and tingling that affected "the entire right upper extremity." (*Id.*). Plaintiff also noted localized neck pain with Valsalva maneuvers and that the pain no longer improved with exercise. (R. 993-94). Plaintiff further advised that he could sit for two to three hours, stand for two to three hours, and walk six to seven blocks. (R. 993). He also

---

[19] It appears that the record is missing two pages of this report that should come after R. 857 and R. 858. (*Compare* R. 857, *with* R. 858 *and* R. 859).

stated that he could lift zero pounds with his right upper extremity and thirty pounds with his left upper extremity. (*Id.*).

Prior to the accident, Plaintiff enjoyed playing baseball and going to the gym, but he could no longer engage in these activities. (R. 994).  According to Plaintiff, he had no problems with personal hygiene and could occasionally shop and do "light duties," but he did not participate in household chores. (*Id.*).  His activities of daily living included staying home, and his present hobbies included watching television. (*Id.*).

On examination, Dr. Zaretsky observed a mild palpable spasm in Plaintiff's cervical spine and mild tenderness about Plaintiff's paravertebral musculature and right trapezil. (R. 996).  Plaintiff experienced pain upon range of motion, which revealed flexion at 30 degrees, extension at 30 degrees, and rotation to the right and left at 20 degrees. (*Id.*).  Cervical Spine Compression and Spurling tests were positive for localized pain in the cervical spine, but not arm pain. (*Id.*).  However, Dr. Zaretsky noted normal muscle strength, reflexes, sensation, and grip strength on all sides. (*Id.*).  When examining Plaintiff's right shoulder girdle, Dr. Zaretsky noted "well healed" surgical wounds. (*Id.*).  Similarly, Dr. Zaretsky noted no tenderness to palpation, normal scapulothoracic motion, full muscle strength, no instability, and intact neurovascular results. (*Id.*).  However, the right shoulder exhibited a limited range of motion, with forward flexion and abduction at 130 degrees, extension at 50 degrees, adduction at 30 degrees and internal rotation to "L2-L3" causing complaints of pain and tightness at the extremes. (*Id.*).  Dr. Zaretsky also observed mildly positive Neer and Hawkins signs. (*Id.*).

Dr. Zaretsky opined that Plaintiff had a "strain/sprain of the cervical spine" that was causally related to the accident. (R. 997).  He recommended physical therapy, but no further therapeutic pain management injections. (*Id.*).  He advised that Plaintiff had a "moderate partial

disability" and could participate in work involving "light duty," *i.e.*, "exerting up to 20 pounds of force occasionally and/or up to 20 pounds of force frequently and/or a negligible amount of force constantly to move objects." (*Id.*).  He further recommended avoidance of repetitive overhead lifting with the right upper extremity. (*Id.*).

On March 4, 2015, Plaintiff told Dr. Zaretsky that his right shoulder had improved twenty-five percent to a pain scale of "6" to "7/10," but that his cervical spine pain was worse, even with physical therapy, with pain on a scale of "10/10." (R. 958).  He estimated that he could lift ten pounds with his right upper extremity and thirty to forty pounds with his left upper extremity. (*Id.*).  This time, on examination, although Plaintiff again demonstrated mild palpable spasm in his cervical spine, Dr. Zaretsky observed no spasm involving the trapezil. (R. 961).  Plaintiff's cervical spine exhibited the same range of motion as at the prior visit, with additional pain upon lateral bending to 20 degrees on both sides. (*Id.*).  Dr. Zaretsky observed the same range of motion and pain in Plaintiff's right shoulder, as well as tenderness in the coracoacromial arch. (R. 962).  However, Plaintiff's rotator cuff strength was "5/5" in all planes. (*Id.*).  Moreover, there was no instability in the shoulder girdle, and it was neurovascularly intact. (*Id.*).

Dr. Zaretsky noted that Plaintiff's "[s]train/sprain syndrome of the cervical spine" was "chronic," and also diagnosed "[d]erangement of the right shoulder girdle status post arthroscopic surgery." (*Id.*).  He opined that Plaintiff had reached maximum medical improvement from active physical therapy for his cervical spine and recommended a home exercise program. (*Id.*).  He further advised that Plaintiff had a "cause-related moderate partial disability defined as 50%," and reiterated Plaintiff's ability to participate in work with "light duty restrictions." (*Id.*).  His definition of these restrictions matched those set forth in his

previous evaluation, except that he recommended exerting "up to 10 pounds of force frequently," rather than "20 pounds." (*Compare* R. 962 *with* R. 997).

**(c) William Walsh, M.D.**

Dr. William Walsh submitted additional independent medical evaluations for Plaintiff's workers' compensation claim on May 11 and October 28, 2015. (R. 964, 987).  On May 11, 2015, Plaintiff continued to complain of pain in his right shoulder, right amputated finger, and neck radiating to his arm, which was worse in the morning and at night. (R. 965).  He told Dr. Walsh that he could walk for six blocks and stand for two to three hours before having to sit down, and that he could "sit with limitation secondary to pain." (*Id.*).  He was unable to wash dishes, wash clothes, vacuum, sweep, cook, play sports or engage in childcare. (*Id.*).  His typical activities included "taking kids to school," watching television and walking. (*Id.*).

On examination, Plaintiff exhibited a normal gait. (R. 966).  Dr. Walsh observed an arthroscopic surgical scar on Plaintiff's right shoulder and tenderness on palpation in the supraspinatus. (*Id.*).  The shoulder's range of motion included forward flexion at 90 degrees, extension at 40 degrees, abduction at 90 degrees, adduction at 40 degrees, and internal and external rotation at 80 degrees.[20] (*Id.*).  However, an impingement test was negative and there was no swelling, effusion, erythema or heat. (R. 966-67).  Plaintiff's right hand, fingers and wrist showed amputation of the right small finger at the DIP joint, but no abnormalities, including the same range of motion as the left side. (R. 967).  Dr. Walsh diagnosed status post right shoulder arthroscopic surgery and right fifth finger amputation "at DIP," and concluded that there "[wa]s evidence of a mild partial causally related disability." (*Id.*).

---

[20] Dr. Walsh noted that normal ranges of motion for the shoulder include 170-80 degrees for forward flexion, 40 degrees for extension, 170-180 degrees for abduction, 45 degrees for adduction, and 80-90 degrees for internal and external rotation. (*Id.*).

At the October 25, 2015 evaluation, Plaintiff stated that he could only stand for two hours before having to sit, and that he could only sit for two hours before changing positions due to pain. (R. 988).  He added that his neck pain was aggravated by movement. (*Id.*).  He was unable to tie his shoes, shop or run errands, and his activities of daily living were limited to "taking kids to school" and going to church. (*Id.*).  Plaintiff's right shoulder range of motion exhibited adduction at 45 degrees and internal rotation at 60 degrees, but was otherwise unchanged. (R. 989).

Dr. Walsh added a "resolved" "right wrist/hand sprain/strain" to the list of diagnoses and found that Plaintiff had reached maximum medical improvement in the area of orthopedics. (R. 990).  He identified a schedule loss of use of the right fifth finger at fifty percent, but no such loss of use of the right wrist. (*Id.*).  With regard to Plaintiff's right shoulder, he found a fifteen percent loss of use, but noted that the "ranges of motion [we]re out of proportion to [the] injury sustained" and that Plaintiff's surgery in 2014 "should have improved his ranges of motion." (*Id.*).  Dr. Wash "suspect[ed] symptom amplification at the time of th[e] examination." (*Id.*).

**ii.  State Agency Consultants**

**(a) Sharon Revan, M.D.**

On May 17, 2016, Plaintiff saw Dr. Sharon Revan for a consultative physical evaluation. (R. 2009-12).  In addition to diabetes, Plaintiff's chief complaint was a history of neck and right shoulder pain following a construction accident in 2012. (R. 2009).  He explained that he was diagnosed with diabetes in 2001, causing polyuria and polydipsia. (*Id.*).  Although he experienced tingling in his right hand, he lacked eye, kidney or heart problems. (*Id.*).  His glucose levels fluctuated between "145" in the morning and "250" and "280" at night. (*Id.*).

Plaintiff complained that his shoulder surgery had not helped his pain. (*Id.*).  He stated that previous neck injections also did not help "intermittent squeezing pain" in his neck at a level of "8/10." (*Id.*).  Although it was "better with medications" and, for a few hours, physical therapy, his neck pain worsened when he lifted or bent his head. (*Id.*).  Plaintiff had no complaints with regard to sitting or standing, but laying down caused dizziness, and walking three to four blocks caused pain. (*Id.*).

On examination, Plaintiff exhibited a normal gait, with no acute distress or difficulty walking on his heels and toes. (R. 2010).  He had a full squat and normal stance. (*Id.*).  He did not use any assistive devices, needed no help changing for the examination or getting on and off of the examination table, and was able to rise from his chair without difficulty. (*Id.*).  Dr. Revan observed full flexion, extension, lateral flexion bilaterally, and full rotary movement in Plaintiff's cervical spine. (R. 2011).  Plaintiff had a lumbar spine flexion of seventy-five degrees and a right straight leg raise test ("SLR") triggered lateral hip pain. (*Id.*).  His right shoulder could elevate forward 90 degrees, whereas his left shoulder could do so up to 150 degrees. (*Id.*).  In addition, the examination showed 90 degree abduction on the right and 150 degrees on the left; present bilateral adduction; 30 degree internal rotation on the right and 40 degrees on the left; and 45 degree external rotation on the right and 90 degrees on the left. (*Id.*).  The rest of Plaintiff's musculoskeletal examination was normal. (*Id.*).

Neurologically, Dr. Revan noted no sensory deficits, with equal deep tendon reflexes in his upper and lower extremities. (*Id.*).  Plaintiff exhibited strength in these areas at a scale of "4/5" in his right upper extremity compared to "5/5" on the left side. (*Id.*).  Dr. Revan found no other abnormalities in Plaintiff's extremities and his "[h]and and finger dexterity grossly intact," with a grip strength of "4/5" on the right and "5/5" on the left. (*Id.*).

Plaintiff told Dr. Revan that he was able to shower and dress himself, but that his sister helped with cooking, cleaning, laundry and shopping due to his right hand pain. (R. 2010). His other activities of daily living included listening to the radio, going to church, and following up with his doctor. (*Id.*).

Dr. Revan diagnosed neck and right shoulder pain as well as diabetes, and assigned a fair prognosis. (R. 2011-12). In a medical source statement, she opined that Plaintiff had moderate limitations "with the right upper extremity for fine and gross motor activity, due to pain." (R. 2012). She also identified mild limitations in "laying down, due to dizziness[] and walking, due to pain," as well as "mild to moderate limitations with activities of daily living." (*Id.*). However, she found no limitations in sitting, standing or personal grooming. (*Id.*).

**(b) L. Bennett**

On June 8, 2016, Single Decisionmaker ("SDM") L. Bennett, a State agency consultant, completed a residual functional capacity evaluation of Plaintiff's "[u]nspecified arthropathies" and diabetes based on the available medical evidence. (R. 68). As to exertional limitations, SDM Bennett opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of over six hours in an eight-hour workday, and push and/or pull without limitations. (R. 70). SDM Bennett identified manipulative limitations in right overhead reaching and fingering, such that Plaintiff could only occasionally reach overhead with the right arm and do fine manipulation with the right hand. (*Id.*). However, SDM Bennett did not identify any handling or feeling limitations, and opined that Plaintiff lacked postural limitations. (*Id.*). SDM Bennett further explained that "[p]er objective medical evidence[,]" Plaintiff "retain[ed] the capacity to perform light work . . . on a sustained basis" with the listed restrictions. (R. 71).

**C.  Nonmedical Evidence**

In a face-to-face agency interview on April 18, 2016, it was noted that Plaintiff had difficulty walking and walked "slowly." (R. 225).  On the same date, Plaintiff submitted a Disability Report stating that he could not speak, read or understand English. (R. 227).  The Disability Report also stated that Plaintiff could not write more than his name in English and that he completed the eleventh grade. (R. 227, 229).  Plaintiff listed herniated cervical discs, diabetes, high cholesterol, and right shoulder, right pinky finger and neck issues as the conditions limiting his ability to work. (R. 228).

In a Function Report dated May 2, 2016, Plaintiff stated that his activities of daily living included taking a bath, having breakfast, taking his medicine, going for a walk, resting, having lunch, and going to any appointments. (R. 238).  According to Plaintiff, before his injuries occurred, he was able to work in construction, cook, play sports and sleep consistently, without pain. (R. 239, 243, 245).  Now, however, he was unable to lift or "do anything with the right hand." (R. 238-39; *see also* R. 243).  Therefore, he also could not dress or do chores, and his sister prepared all of his meals. (R. 239-40).  He also struggled with reaching. (R. 243).  Plaintiff further explained that he could not walk "to[o] much," (*Id.*), stating that he required a thirty-minute rest after walking for twenty minutes, (R. 244).  Sometimes, he could not finish certain tasks, such as chores, "because of the pain." (*Id.*).

However, Plaintiff walked outside and went to church "every day," used taxis, and shopped weekly with his sister. (R. 241-42).  His hobbies included reading, watching television, walking and going to church. (R. 242).  He also spent time with his family. (*Id.*).

**D.  Plaintiff's Testimony**

Christopher Latham represented Plaintiff at the July 30, 2018 hearing. (R. 34).  Plaintiff

testified with the assistance of an interpreter, but on one occasion, responded to the ALJ in

Spanish without waiting for a translation. (R. 36-37).  Plaintiff testified that he was right-handed

and last worked fulltime in demolition at Carmel York, Incorporated, where he had an accident

that caused disabling injuries to his right hand, neck and right shoulder. (R. 42-44).  Although the

job normally required lifting or carrying 50 to 100 pounds, his accident occurred while he "was

taking a garbage can that weigh[ed] about 800 pounds [uphill]." (R. 44, 46).  Prior to his

demolition work, Plaintiff worked fulltime at a grocery store, unpacking and packing groceries

that weighed between fifty and eighty pounds. (R. 44-45).  Plaintiff worked for the grocery store

for eight to nine years and for the demolition company for eight years. (R. 45).

During the accident, the garbage can "let go" and fell backwards onto Plaintiff's shoulder

and one of the fingers on his right hand. (*See* R. 46).  As a result, Plaintiff required separate

surgeries on his finger, shoulder and neck. (R. 46-48).  However, even after the surgeries,

Plaintiff could not feel or grab anything with his finger, his shoulder pain stayed the same, and

his neck pain was "better . . . just a little bit." (R. 47-48).  Plaintiff stated that with regard to his

shoulder, his doctor said "he cannot do anything" beyond the surgery besides prescribing cortisol

"because it's a composition fracture." (*Id.*).  Similarly, Dr. McCance, who performed Plaintiff's

neck surgery, stated that the procedure was "the most that he can do." (R. 48-49).  Plaintiff's

ongoing shoulder pain prevented him from lifting his arm higher than a table, as well as lifting

and carrying more than five pounds. (R. 49-50).  Plaintiff had pain in his neck "24/7" despite

injections and taking six to eight pills of Tylenol, Motrin and Percocet per day to "at least calm

the pain." (R. 48-49).  This pain made it difficult and sometimes impossible to move his neck, requiring him to move his body in certain directions instead. (R. 50).

Plaintiff explained that his neck pain also caused headaches, which prevented him from walking more than twenty-five to forty-five minutes. (R. 51).  Sometimes, he was able to walk for twenty-five minutes twice per week, but on some days, did not leave the house because of the pain. (*Id.*).  Furthermore, Plaintiff experienced dizziness if he stood for more than an hour or hour-and-a-half, which required him to sit down, but sitting for more than two hours caused further pain in his neck and headaches. (R. 51-52).  Therefore, in order to be able to sit for two-hour periods, Plaintiff also needed to take breaks where he "lay [his] head and let [his] neck rest." (R. 52).  Plaintiff took these breaks four to five times per day, but on some days, did not feel like waking up at all. (R. 53).

According to Plaintiff, this neck pain, as well as his shoulder pain, were the primary reasons he could not work. (R. 48).  He doubted his ability to work even in a job that did not require lifting or carrying and permitted standing and sitting on his own time, because he did not know how to use a computer. (R. 53).  He tried to take computer and English classes twice, but "only lasted two days"  due to pain when walking up and down stairs and moving his neck during class. (R. 53-54).

Plaintiff testified that he was also treated for diabetes, for which he took six pills per day. (R. 50).  His average sugar level was about "100" but it "sometimes" rose to "200" or "300." (*Id.*).  Although his primary care physician opined that his diabetes was "not good" and that he had "problems," Plaintiff was "not sure" whether it interfered with his ability to work. (R. 51).

Plaintiff spent a typical day going to church for an hour "if [he] felt good," picking up food or a beverage at "the corner store," and laying down at home. (R. 54).  His sister did all of

the household chores, grocery shopping and cooking. (*Id.*).  He did not belong to any clubs or

organizations, nor did he participate in any sports or activities outside of the home, although he

did so before the accident. (*Id.*).

Plaintiff attended three years of schooling in the United States, through the eleventh

grade. (R. 46).  Before that, he was educated in the Dominican Republic. (*Id.*).  He did not

receive any licenses or special training for the demolition job. (*Id.*).  Plaintiff testified that he

could "write" and "speak a little bit" of English, but emphasized that "in order to understand

both writing and in English," he had "very, very little" ability. (R. 55).

## E.  The Vocational Expert's Testimony

Vocational Expert ("VE") Janice Hastert was present for Plaintiff's testimony. (R. 37).

The VE explained that Plaintiff's past relevant work consisted of the job title "construction

laborer, DOT code 869.687-026," which qualified as unskilled, "very heavy" work with "an SVP

of two." (R. 55-56).  Plaintiff's grocery work amounted to a position as a "stock clerk; DOT code

299.367-014," which qualified as semiskilled, "heavy" work with "SVP four." (R. 56).  The ALJ

posed a hypothetical to the VE, asking her to assume an individual of Plaintiff's age, education

and past work experience, who had the following limitations:

> [T]his individual is limited to occasionally lifting and/or carrying 20
> pounds, frequently 10 pounds.  He can sit six hours and stand and/or
> walk six hours out of an eight-hour workday.  [He] [is] limited to
> occasional overhead reaching with the right upper extremity, further
> limited to frequent fingering with the right upper extremity.  [He]
> can occasionally climb ladders, ropes, or scaffolds; occasionally
> climb ramps and stairs; [and] must avoid excessive vibration, as well
> as hazards such as unprotected heights and unprotected moving
> machinery.

(*Id.*).  The VE determined that such an individual could not perform Plaintiff's past relevant

work but would be able to perform jobs in the national economy involving light, unskilled work,

such as: (1) a folding machine operator; (2) a casing splitter; and (3) a dessert prep machine feeder. (R. 56-57).  The ALJ asked what reasoning and reading levels were required for these jobs. (R. 57).  The VE responded that the folding machine operator position required a Reasoning Level of 2 and Mathematics and Language Levels of 1, and the other two jobs both required Level 1 for all three categories. (*Id.*).

The ALJ next posed additional hypotheticals involving the same individual with further limitations. (R. 57-58).  She asked the VE whether the same individual could work if, in addition to the limitations previously provided, he required job instruction through demonstration. (R. 57).  The VE determined that the individual would still be able to perform the jobs that she identified. (R. 58).  The VE also determined that the same jobs applied if the individual were limited to no overhead reaching with the right upper extremity. (*Id.*).  Finally, the ALJ asked whether the individual could work if, in addition to requiring training by demonstration and no overhead reaching with the right upper extremity, the individual were limited to occasional fingering and handling with the right upper extremity. (*Id.*).  The VE testified that "the positions remain available." (*Id.*).

On cross-examination, Mr. Latham asked the VE whether the individual from the first hypothetical would be able to work if he "was unable to maintain his neck in a fixed position [and] only occasionally . . . look down." (R. 59).  The VE responded that this limitation would not "have a significant impact" on the individual's employability because "from an ergonomic standpoint, we don't recommend that people look down." (*Id.*).  Mr. Latham next asked whether the same individual would be employable if he "needed to lay down . . . for 20 minutes at a time . . . twice a day." (*Id.*).  The VE stated that such a limitation "would rule out competitive employment." (*Id.*).  The VE gave the same response with regard to an individual with the

limitations from the first hypothetical who was "never able to reach, feel, handle, or push/pull;" "unable to . . . lift zero to five pounds occasionally;" or able to "only occasionally perform line actions [and] gross actions." (R. 59-60).

## F.  The ALJ's Decision

ALJ Morrison applied the five-step procedure established by the Commissioner for evaluating disability claims in her May 30, 2018 decision. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2018).  At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity during the relevant period. (R. 20).  At step two, the ALJ found that Plaintiff had the following severe impairments: cervical degenerative disc disease status post-surgery; right fifth finger amputation; rotator cuff tear of right shoulder; and diabetes mellitus. (*Id.*).  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20-21).

The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following limitations:

> [T]he claimant . . . can lift and carry 20 pound[s] occasionally and 10 pounds frequently, sit for 6 hours out of an 8 hour workday and stand and walk for 6 hours out of any 8 hour workday.  He can perform no overhead reaching with his right upper extremity.  He can perform frequent fingering with the right upper extremity.  He can occasionally climb ladders, ropes, or scaffolds.  He can occasionally climb ramps and stairs.  He should avoid excessive vibrations and hazards such as unprotected heights and unprotected moving machinery.

(R. 21).

In arriving at the RFC, the ALJ first determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms,

Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (R. 22). In assessing the medical opinions, the ALJ assigned "limited weight" to the opinions of the following physicians: Dr. Isani; Dr. Zaretsky, dated July 2, 2014; Dr. Walsh, dated May 11, 2014; Dr. Cordiale; and Dr. McCance, dated January 24, 2017. (R. 25-26). She also assigned "limited weight" to "several . . . assessments" of a "75% or 100% temporary impairment," citing the treatment notes of Dr. Ehrlich, Dr. McMahon and Dr. Ng. (R. 26). The ALJ assigned "great weight" to Dr. Zaretsky's March 4, 2015 opinion, and "significant weight" to the opinions of Dr. Revan and Dr. McCance dated March 10 and August 9, 2017. (*Id.*). At step four, the ALJ found that Plaintiff was not able to perform his past relevant work as a demolition-construction laborer and stock clerk, but that he was "able to communicate in English" and jobs existed in the national economy that Plaintiff could perform based on his "age, education, work experience, and [RFC]." (R. 27-28). Accordingly, the ALJ concluded that Plaintiff was "not disabled" under the relevant framework. (R. 28).

## II. DISCUSSION

Plaintiff contends that the ALJ erred by: (1) failing to perform a function-by-function assessment of his exertional limitations; (2) improperly weighing the opinion evidence in arriving at Plaintiff's RFC; (3) failing to develop the record; and (4) incorrectly concluding that he could communicate in English. (Docket No. 30 at 14-20[21]). The Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence and based on correct legal standards. (Docket No. 32).

---

[21] All page numbers refer to the page numbers assigned upon electronic filing.

## A. Legal Standards

A claimant is disabled if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)) (internal quotation marks omitted).  The Social Security Administration ("SSA") has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v) (2019).

The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128) (internal quotation marks omitted).  At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012).

## B. The Treating Physician Rule

In determining whether a claimant is disabled, an ALJ must give the medical opinion of a treating physician "controlling weight if it is well supported by medical findings and not

38

inconsistent with other substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999).  This is because the treating physician is in a more capable position to provide a detailed picture of a claimant's impairments than consultative physicians who may see the claimant on just one occasion or not at all. *See Estela-Rivera v. Colvin*, No. 13 CV 5060(PKC), 2015 WL 5008250, at *13 (E.D.N.Y. Aug. 20, 2015) (citing 20 C.F.R. § 404.1527(d)(2)).  An ALJ may properly disregard the opinion of a treating physician where the opinion is contradicted by the weight of other record evidence, *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999), or if it is internally inconsistent or otherwise uninformative, *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *see also Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (summary order) ("A physician's opinions are given less weight when his opinions are internally inconsistent.").

Where the ALJ affords limited weight to the treating source's opinion and more weight to a non-treating source's opinion, he or she must provide "good reasons" for doing so. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also* 20 C.F.R. § 404.1527(c)(2).  In addition, the ALJ must follow "specific procedures . . . in determining the appropriate weight to assign" the treating source's opinion. *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).  The ALJ must "explicitly consider the following, nonexclusive *Burgess* factors: (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.* at 95–96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curium) (citing *Burgess*, 537 F.3d at 129)) (internal quotation marks omitted). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Id.* at 96.  Where an ALJ procedurally errs, "the question becomes whether a searching review of the record . . . assure[s] [the court] . . . that the substance of the treating

physician rule was not traversed." *Id.* (quoting *Halloran*, 362 F.3d at 32) (internal quotation marks omitted).  Remand is appropriate "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion." *Halloran*, 362 F.3d at 33.

## C.  Standard of Review

When reviewing an appeal from a denial of disability insurance benefits, the court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian,* 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)) (internal quotation marks omitted); *see also* 42 U.S.C. § 405(g).  The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal*, 134 F.3d at 501) (internal quotation marks omitted).  However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)) (internal quotation marks omitted). Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.*  "Where there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Commissioner "for further development of the evidence" is appropriate. *Rosa,* 168 F.3d at 82–83 (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)) (internal quotation marks omitted).

**D.  The ALJ's RFC Determination and Treatment of the Opinion Evidence**

Plaintiff argues that in arriving at the RFC, the ALJ erred by: (1) failing to conduct a function-by-function assessment of his impairments; (2) disregarding Plaintiff's assertions regarding his functional limitations; and (3) ignoring certain recommendations by Dr. McCance and Dr. Revan. (Docket Nos. 30 at 14-17; 33 at 3-4).  The Commissioner argues that the ALJ was not required to conduct an explicit function-by-function assessment, and the RFC is supported by substantial evidence because the objective findings as a whole do not corroborate Plaintiff's subjective complaints. (Docket No. 32 at 21-23).  The Commissioner further maintains that the ALJ applied the correct legal standards in weighing the opinion evidence, and the RFC is largely consistent with Dr. Revan's opinion. (*Id.* at 25-26).  The Court finds that the ALJ failed to provide an adequate function-by-function assessment and improperly disregarded certain treating physician opinions, warranting remand.

**1.  Function-By-Function Assessment**

The RFC is "what a claimant can still do in a work setting, despite physical and/or mental limitations caused by impairments and any related symptoms, such as pain." *Traufler v. Astrue*, No. 7:11-1089, 2012 WL 7753772, at *3 (N.D.N.Y. Nov. 30, 2012), *report and recommendation adopted*, 2013 WL 1092124 (N.D.N.Y. Mar. 15, 2013) (citing 20 C.F.R. §§ 404.1545, 416.945(a)); *see also Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).  "[T]he RFC assessment must include a discussion of the individual's abilities on that basis." *Melville*, 198 F.3d at 52 (quoting Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184, at *2 (July 2, 1996)) (internal quotation marks omitted).

"Before an ALJ classifies a claimant's RFC based on exertional levels of work (*i.e.*, whether the claimant can perform sedentary, light, medium, heavy, or very heavy work), he [or]

[she] must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Cichocki*, 729 F.3d at 176 (quoting SSR 96-8P, 1996 WL 374184, at *2) (internal quotation marks omitted).  Such an assessment should discuss "physical abilities (*e.g.*, sitting, standing, walking, lifting, carrying, pushing, pulling) and other manipulative or postural functions (*e.g.*, reaching, handling, stooping, or crouching) that may reduce a claimant's ability to do past work and other work." *See Lanza v. Berryhill*, No. 19 Civ. 6783 (AT) (RWL), 2020 WL 5606845, at *18 (S.D.N.Y. Aug. 27, 2020), *report and recommendation adopted*, 2020 WL 5603551 (S.D.N.Y. Sept. 18, 2020) (citing 20 C.F.R. § 404.1545(b); SSR 96-8P, 1996 WL 374184, at *5-6).  "Each function must be considered separately (*e.g.*, the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours), even if the final RFC assessment will combine activities (*e.g.*, walk/stand, lift/carry, push/pull)." SSR 96-8P, 1996 WL 374184, at *5-6 (internal quotation marks omitted).  "[T]he RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence." *Glessing v. Comm'r of Soc. Sec.*, No. 13 Civ. 1254(BMC), 2014 WL 1599944, at *9 (E.D.N.Y. Apr. 21, 2014) (quoting *Wichelns v. Comm'r of Soc. Sec.*, No. 5:12–CV–1595 (NAM/ATB), 2014 WL 1311564, at *6 (N.D.N.Y. Mar. 31, 2014)) (internal quotation marks omitted).

Although an explicit function-by-function assessment is not always required, "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Cichocki*, 729 F.3d at 177.  This is because "a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions," which

"could lead to an incorrect use of an exertional category to . . . an erroneous finding that the individual is not disabled." *Id.* at 176 (quoting SSR 96–8P, 1996 WL 374184, at *4) (internal quotation marks omitted).

Here, the ALJ found that Plaintiff could perform light work as defined in 20 C.F.R. § 404.1567(b),[22] but could only occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, sit for six hours out of an eight hour workday, stand and walk for six hours out of an eight hour workday, frequently finger with the right upper extremity, and occasionally climb ladders, ropes, scaffolds, ramps and stairs. (R. 21).  Further, Plaintiff could never reach overhead with the right upper extremity, and was to avoid excessive vibrations and hazards such as unprotected heights and moving machinery. (*Id.*).  The ALJ's decision is devoid of any explanation of Plaintiff's ability to perform these functions at the frequency allotted in a work setting, and does not mention Plaintiff's ability to push or pull. *See Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 439–40 (S.D.N.Y. 2010) ("[T]he ALJ must adequately explain the reasoning underlying an RFC determination and the basis on which it rests.").  The ALJ acknowledged Plaintiff's "moderate to severe degeneration in his cervical spine," right rotator cuff tear and shoulder impingement, and amputated right finger issues, but found that these conditions improved after surgery and caused only "mild" to "moderate ongoing limitations."

---

[22] The regulations provide:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

(R. 22-24).  To support this finding, she explained that according to the medical evidence, Plaintiff retained "some reduced [shoulder and right finger] range of motion" and "some reduced grip strength," but regained much of his shoulder strength as well his cervical spine function after surgery. (R. 23-25).  However, nowhere did the ALJ explain how this evidence translates into the functional capabilities she assigned, or define the scope of the "ongoing limitations" she identified. *See Glessing*, 2014 WL 1599944, at *9 (remanding where "[ALJ's] decision simply list[ed] the ALJ's RFC findings, and then cite[d] particular pieces of evidence in the record, without connecting the two in any way"); (R. 24).

For example, the ALJ's discussion of the medical opinions on which she relied amount to vague, conclusory statements that do not draw a connection between the physicians' recommendations and Plaintiff's specific functional capabilities. *See Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 349 (E.D.N.Y. 2010); *Amrod v. Comm'r of Soc. Sec.*, No. 5:08–CV–464, 2010 WL 55934, at *17 (N.D.N.Y. Jan. 5, 2010).  Although the ALJ afforded "great weight" to Dr. Zaretsky's March 2015 opinion that Plaintiff could occasionally "exert" up to twenty pounds and frequently "exert" up to ten pounds, it is unclear whether the ALJ understood this limitation to apply to carrying, lifting, pushing, pulling, or all of these activities. (R. 25, 962).  Likewise, the ALJ afforded "significant weight" to Dr. Revan and Dr. McCance's May 2016 and August 2017 opinions, but neither opinion provides a functional assessment at a level of specificity that supports many of the ALJ's conclusions. (R. 26).  Dr. Revan assigned unspecified "moderate limitations" in the use of the upper right extremity for fine and gross activity, mild limitations in walking, and "mild to moderate limits in activities of daily living" without further defining those activities. (R. 2012).  Dr. McCance's August 2017 recommendation instructed Plaintiff to return to "all normal activities" when he recovered from

his cervical spine surgery, without expressing an opinion as to Plaintiff's ability to perform specific physical activities in a work setting.[23] (R. 2043).  The ALJ does not explain how these general findings provide a basis for the exertional limitations in the RFC at the frequencies that she assessed. *See Hilsdorf*, 724 F. Supp. 2d at 349.  Nor does she explain how these limitations "enable [Plaintiff] to meet" the specific "demands of . . . 'light work.'" *See id.*

The ALJ's failure to assess Plaintiff's ability to push or pull is especially problematic because according to her own analysis, Plaintiff's right shoulder and hand functioning remained limited after surgery, arguably reducing this capacity and Plaintiff's ability to work.[24] (R. 24). "For the ALJ to conclude [that] [Plaintiff] is able to perform 'light work' without restrictions specific to pushing or pulling, the ALJ must have implicitly concluded that [he] is not restricted or limited in his physical abilities to push or pull arm . . . controls." *See Lanza*, 2020 WL 5606845, at *19.  This is because "light work" necessarily involves "some pushing and pulling of arm or leg controls." *See id.* (citing 20 C.F.R. § 404.1567(b)) (internal quotation marks omitted); *supra* n.22.  The ALJ did not explain what evidence in the record supports her conclusion that Plaintiff lacked limitations in these skills. *See Lanza*, 2020 WL 5606845, at *19; *see also Welch v. Comm'r of Soc. Sec.*, 17-CV-6764 (JS), 2019 WL 4279269, at *2–3 (E.D.N.Y. Sept. 10, 2019) (remanding where ALJ prescribed "light work" and failed to "explicitly address [p]laintiff's capacity to use her hands").  Therefore, the ALJ impermissibly overlooked potential

---

[23] As previously noted, Dr. McCance did not incorporate any standing limitations into his recommendation at the conclusion of the examination. (R. 2043); *see supra* n.18.  Therefore, Dr. McCance's August 2017 opinion cannot be the basis for the RFC's limitation of standing and walking for six hours in an eight-hour workday. (R. 21, 26).

[24] However, Plaintiff is incorrect that he testified that he "ha[d] limited ability to push and pull." (Docket No. 30 at 16).  At no point during the hearing did Plaintiff mention pushing or pulling. (*See generally* R. 34-62).  However, Plaintiff did testify that he "absolutely" still had problems with his right shoulder, which arguably could affect his ability to push and pull. (R. 49).

functional limitations that may disqualify Plaintiff from work, potentially leading to "an erroneous finding that [Plaintiff] is not disabled."[25] *See Cichocki*, 729 F.3d at 176.

On this record, the Court is unable to determine whether the ALJ assessed no pushing and pulling limitations upon reviewing the evidence, or simply failed to assess such limitations. *See Welch*, 2019 WL 4279269, at *3. Furthermore, the ALJ did not clearly explain the medical basis for the remaining exertional aspects of the RFC, and therefore the Court cannot determine whether the RFC is based on substantial evidence.[26] *See id.* As a result, remand is required. On remand, the ALJ shall conduct an explicit function-by-function analysis of Plaintiff's ability to perform functional tasks that could be affected by his amputated right finger, right shoulder status post arthroscopy, herniated discs, and disc bulges, such as lifting, carrying, pushing, pulling, handling, fingering, standing, sitting and walking, in light of specific medical evidence.

## 2. Treatment of Opinion Evidence

### i. Dr. Ng, Dr. Moshe and Dr. Cordiale

With regard to the ALJ's analysis of the opinion evidence, the Court first notes *sua sponte* that the ALJ failed to follow the treating physician rule with respect to three opinions

---

[25] Plaintiff argues that in assessing the RFC, the ALJ improperly overlooked much of his testimony and reported activities of daily living noting limitations in pushing, pulling, lifting, standing and walking. (Docket No. 30 at 15-16). The ALJ rejected these assertions under the rationale that the medical findings did not corroborate Plaintiff's subjective reports of pain and difficulty with these activities, such that Plaintiff was not credible. (R. 22, 24-26). Because Plaintiff does not challenge this credibility assessment, the Court does not address it. (*See* Docket No. 30 at 15-17). However, on remand, the ALJ is to reconsider Plaintiff's credibility after conducting a proper function-by-function assessment, and after further correcting her analytical approach consistent with this Opinion & Order.

[26] However, the Court rejects Plaintiff's belated assertion that the ALJ failed to sufficiently address any exertional limitations stemming from diabetes. (Docket No. 33 at 3). The ALJ provided a detailed and accurate analysis of numerous records regarding Plaintiff's treatment for diabetes, and simply found that there was no evidence "indicative of him having significant limitations from this impairment." (R. 24). Therefore, remand is not required for on this ground. *See Williams v. Astrue*, No. 11-CV-5583 (DLI), 2013 WL 5532694, at *15 (E.D.N.Y. Sept. 30, 2013) (function-by-function assessment was adequate where ALJ expressly found "no evidence of any functional restrictions secondary to any non-exertional impairment"). In any event, because Plaintiff does not advance this contention anywhere else in his submissions, the Court declines to address it further. *See Cunningham v. Comm'r of Soc. Sec.*, No. 17-CV-1135-FPG, 2019 WL 2059213, at *4 n.3 (W.D.N.Y. May 9, 2019).

rendered early in the relevant period.  First, the ALJ afforded "limited weight" to Dr. Ng's findings in 2014 that Plaintiff was "100%" "temporar[ily] impair[ed]," without addressing her conclusions that Plaintiff's pain precluded him from work and normal functioning. (R. 25, 722, 724, 726, 728, 733).  Second, the ALJ failed to discuss Dr. Moshe's recommendations in 2015 that Plaintiff avoid overhead activities, lifting and carrying five to ten pounds, above-shoulder activities, and sudden neck movements. (R. 612, 799, 829).  Third, because Plaintiff's right upper extremity strength improved after surgery, the ALJ assigned "little weight" to Dr. Cordiale's 2015 recommendations that Plaintiff avoid heavy lifting, carrying and bending, when these findings do not speak to Plaintiff's capacity to bend. (R. 26, 333, 336, 339).  These errors may affect the outcome because several of these physicians' recommendations are not reflected in the RFC and conflict with Dr. Zaretksy's March 2015 opinion – which the ALJ assigned "great weight" – that Plaintiff could "exert" twenty pounds occasionally and lift ten pounds frequently, with no further restrictions on work activities. (R. 21, 25, 962).  Furthermore, when taken together, these opinions suggest that regardless of any improvement after Plaintiff's cervical spine surgery in 2017, he had significant limitations until then that prevented him from working for over twelve months, which would render him disabled for that interim period. *See Kelly v. Sec'y of Health & Hum. Servs.*, 871 F. Supp. 586, 594–97 (W.D.N.Y. 1994).

Ordinarily, a treating source's opinion must be afforded controlling weight, absent consideration of the *Burgess* factors and explicitly noted "good reasons" for not doing so. 20 C.F.R. § 404.1527(c)(2); *see also Halloran*, 362 F.3d at 32–33.  "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific." *LaTorres v. Comm'r of Soc. Sec. Admin.*, 485 F. Supp. 3d 482, 492 (S.D.N.Y. Sept. 9, 2020) (quoting *Harris v. Colvin*, 149 F. Supp. 3d 435, 441 (W.D.N.Y. 2016)) (internal quotation marks omitted).

Whereas the treating physician rule traditionally applies to medical opinions rather than treatment notes, courts have held that such notes must be afforded the same level of deference as formal treating source opinions where they "reflect judgments" about the nature and severity of the plaintiff's conditions. *See Wider v. Colvin*, 245 F. Supp. 3d 381, 389–91 (E.D.N.Y. 2017); *see also Gomez v. Saul*, 19 Civ. 9278 (PMH)(JCM), 2020 WL 8620075, at *22 (S.D.N.Y. Dec. 23, 2020), *report and recommendation adopted sub nom. Gomez v. Comm'r of Soc. Sec.*, 2021 WL 706744 (S.D.N.Y. Feb. 22, 2021). Under this rationale, Dr. Moshe's recommendations as to Plaintiff's capabilities at the conclusion of several treatment notes were subject to the treating physician rule, yet the ALJ did not address them at all. This failure alone constitutes legal error warranting remand. *See Wider*, 245 F. Supp. 3d at 389–91.

In addition, although it is proper to disregard any medical opinion's ultimate conclusions "as to whether, and to what extent, [P]laintiff was 'disabled,'" it is erroneous to assign "little weight" to a functional assessment simply because it was rendered in the context of a workers' compensation claim. *See Pataro v. Berryhill*, 17-CV-6165 (JGK) (BCM), 2019 WL 1244664, at *17 (S.D.N.Y. Mar. 1, 2019), *report and recommendation adopted*, 2019 WL 1244325 (S.D.N.Y. Mar. 18, 2019). Indeed, the ultimate issue of whether a claimant is disabled is exclusively reserved for the Commissioner. *See Snell*, 177 F.3d at 133. Consequently, opinions submitted in support of workers' compensation benefits that designate a claimant as "disabled" by a certain percentage improperly invade the Commissioner's role, such that it is appropriate to afford them "little weight." *See Brodie v. Comm'r of Soc. Sec.*, 19 Civ. 06968 (PAE) (RWL), 2020 WL 5754607, at *7 (S.D.N.Y. Aug. 25, 2020), *report and recommendation adopted sub nom. Brodie v. Saul*, 2020 WL 5775234 (S.D.N.Y. Sept. 28, 2020). Moreover, because different standards govern disability under workers' compensation laws versus the Social Security Act,

temporary disability percentage designations provided in the context of workers' compensation are "not controlling with respect to a claim of disability . . . under the Act." *See id.* (quoting *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 345 (S.D.N.Y. 2020)) (internal quotation marks omitted); *Johnson v. Comm'r of Soc. Sec.*, 17-CV-5598 (BCM), 2018 WL 3650162, at *16–17 (S.D.N.Y. July 31, 2018), *aff'd sub nom. Johnson v. Comm'r of Soc. Sec. Admin.*, 776 F. App'x 744 (2d Cir. 2019); *see also Urbanak v. Berryhill*, 17 Civ. 5515 (CM)(HBP), 2018 WL 3750513, *24 (S.D.N.Y. July 18, 2018).  That said, "an opinion about a claimant's functional assessment, as opposed to a general disability conclusion, should not be rejected simply because" it was rendered in connection with a workers' compensation claim. *See Pataro*, 2019 WL 1244664, at *17.  Therefore, the fact that a treating physician's opinion was intended to render "temporary restrictions" in this context is not a "good reason" for declining to afford it controlling weight. *See id.*; *cf. Urbanak*, 2018 WL 3750513, *25 (noting that ALJ appropriately afforded "little weight" to treating physician opinion that plaintiff was "100% disabled" and "great weight" to his functional assessments and medical observations).

For these reasons, the ALJ was required to assign any functional assessment provided by Plaintiff's treating physicians "controlling weight" – despite the workers' compensation context in which they were rendered – unless "good reasons" existed to disregard them. *See Pataro*, 2019 WL 1244664, at *17.  However, here, the ALJ did not do so.  With respect to Dr. Ng's recommendations, the ALJ assigned them "limited weight" on the grounds that their "temporary" percentage impairment findings "were not intended as permanent disability findings," explaining elsewhere that percentage disability findings in the context of workers' compensation "differ from the standards used by the Social Security Administration to determine disability." (R. 25-26).  Although it was correct to assign such weight to Dr. Ng's percentage disability findings, *see*

*Brodie*, 2020 WL 5754607, at *7, this analysis impermissibly ignores Dr. Ng's opinions based on a number of appointments in 2014 that Plaintiff's persistent pain limited his functioning such that he could not engage in work activities at all. (R. 722, 724, 726, 728, 733); *see also Sepa v. Colvin*, 15-cv-7209 (JGK), 2016 WL 7442658, at *7 (S.D.N.Y. Dec. 27, 2016) (finding that treating physician's conclusion that plaintiff was unable to work was subject to treating physician rule). The ALJ should have at least explained what weight she afforded to this aspect of Dr. Ng's recommendations and provided "good reasons" for not deeming it controlling as to whether Plaintiff was disabled even after his right shoulder surgery in February 2014. *See Pataro*, 2019 WL 1244664, at *17.

Similarly, the ALJ did not reference Dr. Moshe's recommendations, such that this Court is unable to determine whether the ALJ considered them at all. In addition to finding that Plaintiff was "100% temporarily impaired," Dr. Moshe's treatment notes on three occasions in 2015 foreclosed carrying and lifting five to ten pounds as well as sudden neck movements. (R. 612, 799, 829). Although it would have been appropriate to afford less weight to these findings as to Plaintiff's percentage impairment, this rationale does not apply to the functional aspects of Dr. Moshe's recommendations. *See Pataro*, 2019 WL 1244664, at *17. It was especially crucial for the ALJ to address these assessments and explain what weight they were given, because they expressly contradict those of Dr. Zaretsky in March 2015 – permitting Plaintiff to "exert" twenty pounds occasionally and ten pounds frequently – which the ALJ seems to have incorporated into the lifting and carrying limitations in the RFC. (*Compare* R. 612, 799, 829, *with* R. 21 *and* R. 962). Therefore, remand is required, because in ignoring Dr. Moshe's assessment, the ALJ failed to reconcile inconsistencies in the evidence regarding Plaintiff's functional capacity in 2015. *See Cichocki*, 729 F.3d at 176; *Schaal v. Callahan*, 993 F. Supp. 85, 96 (D. Conn. 1997).

The same is true regarding Dr. Cordiale's recommendations in the same year that Plaintiff refrain from bending, as well as heavy lifting and carrying. (R. 333, 336, 339). The ALJ assigned "little weight" to this opinion because it allotted "temporary restrictions placed during the course of [Plaintiff's] treatment" and Plaintiff regained upper extremity strength "after he underwent surgery." (R. 26). To the extent that this reference to "temporary restrictions" was meant to categorize Dr. Cordiale's assessment as not controlling due to its connection with Plaintiff's workers' compensation claim, as explained, that justification is unavailing. *See Pataro*, 2019 WL 1244664, at *17; (R. 26). Moreover, Dr. Cordiale's assessment can hardly be seen as "temporary," as he recommended cervical spine surgery to resolve Plaintiff's ongoing cervical spine limitations and arm pain, and Plaintiff did not receive such surgery until over a year later, in 2017. (R. 26, 336, 2052). This aspect of Dr. Cordiale's opinion is consistent with Dr. McCance's January 10, 2017 treatment notes, which also opined that Plaintiff required surgery to address his arm pain and neuropathy. (R. 2037-38). Based on these treating physicians' ongoing observations, it is plausible that Plaintiff was precluded from work until he received the subject cervical spine surgery.

Finally, although an ALJ may assign a treating physician's opinion less-than-controlling weight where it contradicts the balance of medical evidence, *see, e.g.*, *Zacharopoulos v. Saul*, CV 19-5075 (GRB), 2021 WL 235630, at *14 (E.D.N.Y. Jan. 25, 2021), that reasoning is inapplicable to Dr. Cordiale's restrictions on bending, (R. 339, 336, 333). The fact that Plaintiff regained upper extremity strength after the 2017 surgery sheds no light on this skill, which does not involve the upper extremities. (R. 26). Consequently, absent any other reasons for disregarding it, Dr. Cordiale's opinion as to Plaintiff's bending limitations deserved "controlling weight." *See Wider*, 245 F. Supp. 3d at 389–91. The ALJ's failure to provide sufficient reasons

for deviating from this rule warrants remand. *See id.*  This is especially so because Plaintiff's

failure to receive the recommended surgery for almost two more years begs the question whether

he was employable before that procedure took place. *See* 20 C.F.R. § 404.1509.

Indeed, regardless of Plaintiff's capabilities after his final surgery in 2017, taken together,

the above three opinions suggest far more restrictive limitations in 2014 and 2015 than those

prescribed by the RFC. (R. 21).  To qualify as disabling, an impairment "must have lasted or

must be expected to last for a continuous period of at least twelve months." 20 C.F.R. §

404.1509.  Courts have recognized that remand is warranted where, as here, the ALJ fails to

consider evidence of disabling conditions lasting over twelve months, even though the claimant

may not have been disabled for the entire alleged period of disability. *See, e.g.*, *Nettles v. Saul*,

18-CV-06369-LGF, 2019 WL 4743659, at *6 (W.D.N.Y. Sept. 30, 2019) (ALJ committed error

by failing to afford treating physician opinion controlling weight given evidence that mental

impairments "continued for more than a year after [physician's] evaluation"); *Alexander v.

Comm'r of Soc. Sec.*, No. 5:14–cv–00039, 2014 WL 7392112, at *6–7 (D. Vt. Dec. 29, 2014)

(remanding for consideration of treating physician opinions supporting claim that elbow injury

lasted over twelve months); *Kelly*, 871 F. Supp. at 594–97 (remanding where ALJ improperly

disregarded treating physician opinion that claimant could not work for more than one year

following surgery).

In her decision, ALJ Morrison acknowledged that Plaintiff's "moderate to severe

degeneration in [the] cervical spine," as well as right shoulder impairments, were significant

enough to require surgery. (R. 23-26).  However, the ALJ's functional analysis focused almost

exclusively on Plaintiff's capabilities after his final cervical spine surgery in January 2017, even

though almost four years passed between Plaintiff's accident and that procedure. (*Id.*).  With

regard to that four-year period, the ALJ stated conclusorily that after Plaintiff's right shoulder surgery in February 2014, he had only "mild" ongoing abnormalities and "moderately reduced" right shoulder range of motion, such that he was able to engage in the functional activities in the RFC. (R. 23).  However, this analysis is flawed for two reasons.  First, it does not account for the more-than twelve month period between the accident and the 2014  right shoulder surgery. (R. 676, 999).  During this time, Plaintiff presented with neck and right shoulder pain as high as "10/10" and "8/10" while exhibiting reduced ranges of motion in both areas, and MRI results confirmed a right rotator cuff tear, impingement, disc herniations and disc bulges. (R. 350, 557-58, 586-88, 647-49, 630-32, 683-87, 715, 751, 2014).  Second, the ALJ's analysis fails to acknowledge Dr. Ng, Dr. Moshe or Dr. Cordiale's opinions that based on similar complaints and medical findings, Plaintiff had more restrictive functional capabilities than those in the RFC in 2014 and 2015 – even after Plaintiff's right shoulder surgery. *See Alexander*, 2014 WL 7392112, at *6–7.  In light of these failures, the ALJ's determination that Plaintiff was employable in the almost-four years prior to his cervical spine surgery on January 11, 2017 is not supported by substantial evidence. *See id.*; (R. 28).  On remand, after correctly weighing the treating physician opinions discussed above, the ALJ is directed to reevaluate the duration of Plaintiff's right shoulder and cervical spine impairments, and consider whether they rendered him temporarily disabled before the 2017 surgery. *See Alexander*, 2014 WL 7392112, at *6–7.

## ii.  Dr. McCance's January 24, 2017 Opinion

Separately, Plaintiff argues that the ALJ erred by declining to incorporate the limitations in Dr. McCance's January 24, 2017 opinion into the RFC.[27] (Docket No. 30 at 16-17).  The

---

[27] Plaintiff also contends that the RFC is not supported by substantial evidence because it does not incorporate the sixty-to-ninety minute standing limitation from Dr. McCance's August 10, 2017 treatment note. (Docket No. 30 at 16).  However, as previously noted, Dr. McCance did not impose such a limitation. *See supra* n.18, 23.

Commissioner contends that the ALJ correctly afforded this opinion "little weight" because it was rendered shortly after Plaintiff's cervical spine surgery. (Docket No. 32 at 23). The Court agrees with the Commissioner that the ALJ properly weighed Dr. McCance's January 24, 2017 opinion because it was clearly intended to govern Plaintiff's post-surgery recovery.

As noted above, "Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion." *Estrella*, 925 F.3d at 95. "First, the ALJ must decide whether the opinion is entitled to controlling weight." *Id.* If there is substantial evidence in the record that contradicts or questions the credibility of a treating source's assessment, the ALJ may give that treating source's opinion less deference. *See Halloran*, 362 F.3d at 32. Second, if the ALJ does not give controlling weight to a treating source's opinion, the ALJ must consider various factors and provide "good reasons" for the weight given. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). If the ALJ does not "explicitly" consider the *Burgess* factors, the case must be remanded unless "a searching review of the record" assures the Court that the ALJ applied "the substance of the treating physician rule." *Estrella*, 925 F.3d at 96 (quoting *Halloran*, 362 F.3d at 32) (internal quotation marks omitted).

Plaintiff saw Dr. McCance for cervical spine issues, including disc herniation and bulging, from September 2016 through September 2017. (R. 2031-43, 2052). Because Plaintiff failed conservative treatment, Dr. McCance performed a right posterior cervical laminoforaminotomy on January 11, 2017 and submitted the subject functional assessment less than two weeks later, on January 24, opining that Plaintiff was "unable to work at this time" due to his surgery. (R. 2021-22). According to a contemporaneous treatment note, Plaintiff reported

that the numbness and tingling in his right arm was a "4/10" and he still experienced posterior neck pain. (R. 2040). Dr. McCance stated that Plaintiff was "recovering well," and that the incision sutures were removed. (*Id.*). The ALJ assigned "limited weight" to Dr. McCance's functional assessment on the ground that it "only represent[ed] [Plaintiff's] condition after his surgery" and was "not consistent with subsequent examinations that showed he regained full strength in his right upper extremity." (R. 26).

After careful review of the record, the Court finds that the ALJ failed to explicitly consider all of the *Burgess* factors in evaluating Dr. McCance's January 24, 2017 opinion, thus committing procedural error. *See Estrella*, 925 F.3d at 96. The Court, therefore, has conducted a "searching review of the record" to determine whether the ALJ applied the substance of the treating physician rule. *See id.* (quoting *Halloran*, 362 F.3d at 32) (internal quotation marks omitted). The record must demonstrate that the ALJ weighed Dr. McCance's January 24, 2017 opinion to "consider how closely [it] align[ed] with the objective medical record evidence." *See Cardoza v. Comm'r of Soc. Sec.*, 353 F. Supp. 3d 267, 283 (S.D.N.Y. 2019). The Court agrees with the Commissioner that the ALJ performed this analysis, and properly discounted the opinion given its inconsistencies with the rest of the record, including his own treatment notes thereafter.

In making this determination, the ALJ considered Dr. McCance's treatment notes from March 2017 and August 2017, both of which documented improved capabilities as Plaintiff recovered from surgery. (R. 26). On March 10, 2017, Plaintiff reported improved numbness in his arm, though some lasting right paracervical and trapezial pain. (R. 2042). Although Plaintiff still demonstrated limited cervical range of motion, his upper extremity motor and neurological results were normal. (*Id.*). At that appointment, Dr. McCance noted that Plaintiff's incision had

healed. (*Id.*).  He expressly changed his instructions for Plaintiff's post-surgery recovery, directing Plaintiff to "avoid excessive lifting" for the following month, and opining that Plaintiff could resume "most activities" thereafter. (*Id.*).  On August 9, 2017, Plaintiff continued to complain of "mild" posterior neck pain, but his upper extremity numbness, paresthesias and weakness were gone, and he demonstrated functional cervical range of motion. (R. 2043).  Dr. McCance again referenced the healed incision and advised him to return to "all normal activities." (*Id.*).

In this regard, the ALJ's reasoning was appropriate and supported by substantial evidence.  An ALJ may properly reject a treating physician's opinion when it conflicts with his or her own treatment notes. *See Pagan v. Colvin*, 15 Civ. 3117 (HBP), 2016 WL 5468331, at *13 (S.D.N.Y. Sept. 29, 2016).  An ALJ may also decline to give controlling weight to a treating physician's opinion where the record as a whole demonstrates improvement in the claimant's functional capacity despite his or her diagnosis. *See Zacharopoulos*, 2021 WL 235630, at *13.  Here, the ALJ did just that.  Dr. McCance's subsequent treatment notes demonstrate that his January 24, 2017 opinion was truly a temporary snapshot of Plaintiff's condition while he was recovering from surgery, and Plaintiff was not required to adhere to such severe restrictions once he had healed. *See id.*; *see also Strong v. Berryhill*, 17-CV-1286F, 2019 WL 2442147, at *5 (W.D.N.Y. June 12, 2019) (finding no error in affording medical opinion "little weight" as it was "situational to Plaintiff's recovery from . . . surgery").  However, as discussed *infra* in Section II.E, because Dr. McCance's March and August 2017 treatment notes do not provide sufficiently detailed functional capacity assessments of Plaintiff's exertional limitations, the ALJ was obligated to develop the record further to ascertain Plaintiff's capacity to work once his recovery was completed.

For these reasons, the ALJ committed no error in affording less weight to Dr. McCance's January 24, 2017 opinion, and was not required to incorporate it into the RFC.

### iii. Dr. Revan

Plaintiff also asserts that the RFC is flawed because it does not sufficiently reflect Dr. Revan's finding that Plaintiff had moderate limitations with the upper right extremity for fine and gross motor activity. (Docket No. 30 at 16-17). The Commissioner responds that the RFC need not perfectly correspond with a medical opinion, and that Dr. Revan's opinion was consistent with light work. (Docket No. 32 at 24, 26). The Court finds that the ALJ's failure to follow the treating physician rule likely impacted her analysis of all opinion evidence predating Plaintiff's cervical spine surgery, such that on remand, the ALJ will need to reassess the weight she afforded to Dr. Revan's consultative findings, as well as the parameters of the RFC. Therefore, Plaintiff's request for remand based on the ALJ's previous analysis of Dr. Revan's opinion is moot. *See generally Urena-Perez v. Astrue*, No. 06 Civ. 2589(JGK), 2009 WL 1726212, at *6 (S.D.N.Y. June 18, 2009).

To provide guidance on remand, however, the Court notes that under some circumstances, it is proper to afford a consultative opinion significant weight. Generally, the Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. However, "[a]n ALJ may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence." *Mayor v. Colvin*, 15 Civ. 0344 (AJP), 2015 WL 9166119, at *18 (S.D.N.Y. Dec. 17, 2015); *see also Rosier v. Colvin*, 586 F. App'x 756, 758 (2d Cir. 2014) (summary order); *Leisten v. Colvin*, No. 12-CV-6698-FPG, 2014 WL 4275710 at *12–15 (W.D.N.Y. Aug. 28, 2014). On the other

hand, "[t]here is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations." *Pellam v. Astrue*, 508 F. App'x 87, 89 (2d Cir. 2013) (summary order).  The ALJ has discretion to weigh the opinion of a consultative examiner and attribute it appropriate weight based on his or her review of the entire record. *See Burnette v. Colvin*, 564 F. App'x 605, 608 (2d Cir. 2014) (summary order); *Torbicki v. Berryhill*, 17-CV-386(MAT), 2018 WL 3751290, at *5 (W.D.N.Y. Aug. 8, 2018) ("[T]he ALJ is free to disregard identified limitations that are not supported by the evidence of record.").  Furthermore, the Commissioner is correct that the RFC need not "perfectly correspond" with any particular medical opinion, as long as the RFC is "consistent with the record as a whole." *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order).  The ALJ is free to reject portions of a consultative examination that do not comport with the rest of the evidence, *see Barry v. Colvin*, 606 F. App'x 621, 624 (2d Cir. 2015) (summary order), as long as he or she explains his or her reasons for doing so. *See Moscatello v. Saul*, 18-CV-1395 (BCM), 2019 WL 4673432, at *14 (S.D.N.Y. Sept. 25, 2019).

With these standards in mind, the Court directs the ALJ to reassess the weight assigned to all aspects of Dr. Revan's opinion, including those noted by Plaintiff, in light of the treating physician evidence predating Plaintiff's January 2017 cervical spine surgery.  If the ALJ chooses to adopt some portions of Dr. Revan's findings, but not others, the ALJ must explain her reasons for doing so. *See id.*

### E.  Duty to Develop the Record

Plaintiff further asserts that the ALJ failed to develop the record because there is no medical evidence supporting "many of the RFC elements," such that the ALJ impermissibly substituted her own lay opinion for that of a physician. (Docket No. 30 at 17-19).  Plaintiff

argues that to remedy this error, the ALJ should be instructed to obtain an RFC assessment from one or more treating physician. (*Id.* at 18).  The Commissioner contends that the ALJ was not remiss in developing the record because an ALJ is permitted to craft an RFC based on raw medical evidence. (Docket No. 32 at 25).  The Court finds that although the Commissioner misstates the law on this point, the ALJ was not required to request further treating physician opinions with respect to Plaintiff's functional capacity before his January 11, 2017 cervical spine surgery.  However, because the treatment notes postdating that procedure are insufficient to render a function-by-function assessment of Plaintiff's ability to work, additional information was necessary to render a proper disability determination for the period after the surgery.

In the Second Circuit, "the ALJ, unlike the judge in a trial, must [her]self affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Pratts*, 94 F.3d at 37 (quoting *Echevarria v. Sec'y of Health and Hum. Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)) (alteration in original) (internal quotation marks omitted).  This affirmative duty requires the ALJ to ensure a complete record of the plaintiff's medical history "even when the claimant is represented by counsel or . . . by a paralegal." *Rosa*, 168 F.3d at 79 (quoting *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)) (internal quotation marks omitted).  "Whether the ALJ has satisfied this obligation or not must be addressed as a threshold issue." *Moreau v. Berryhill*, No. 3:17-CV-396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018).  "Even if the ALJ's decision might otherwise be supported by substantial evidence, the Court cannot reach this conclusion where the decision was based on an incomplete record." *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *12 (S.D.N.Y. July 22, 2015).

In light of the ALJ's duty, as well as the treating physician rule, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative

record." *Rosa*, 168 F.3d at 79.  Moreover, the ALJ may not "simply . . . secure raw data from the treating physician" without requesting an accompanying opinion. *See Hallett v. Astrue*, No. 3:11-cv-1181 (VLB), 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012).  This is because, as the ALJ is not a physician, he or she is not permitted to "engage[] in his [or her] own evaluations of . . . medical findings" without assistance from a person with medical expertise.[28] *See Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996); *see also Davis v. Comm'r of Soc. Sec.*, 5:16-CV-0657 (WBC), 2017 WL 2838162, at *7 (N.D.N.Y. June 30, 2017).

Therefore, on the one hand, "'[w]hen the treatment notes and test results from the claimant's treating physicians do not assess how the claimant's symptoms limit [her] functional capacities,'" the record is incomplete, warranting remand. *Hernandez v. Saul*, No. 3:19-CV-01033 (WIG), 2020 WL 3286954, at *4 (D. Conn. June 18, 2020) (quoting *Angelico v. Colvin*, No. 3:15-CV-00831 (SRU)(JGM), Docket No. 17 at 33 (D. Conn. Feb. 8, 2017)); *see also Brazil v. Berryhill*, 19 Civ. 7041 (RWL), 2020 WL 5440472, at *7 (S.D.N.Y. Sept. 10, 2020).  On the other hand, a lack of a formal source statement from a treating physician does not always require remand *if* the ALJ can glean an informal assessment of the plaintiff's limitations from the treating physician's notes. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order); *Sanchez v. Colvin*, No. 13 Civ. 6303(PAE), 2015 WL 736102, at *5

---

[28] For this reason, the Commissioner's assertion that "ALJs [may] directly . . . analyze raw evidence" "independent of medical conclusions" is generally incorrect. (Docket No. 32 at 25).  Although under some circumstances, an ALJ may craft an RFC without guidance from a medical opinion when the record "contains sufficient evidence to permit [him or her] to render a common-sense RFC determination," *Morrill v. Saul*, 19-CV-6279F, 2020 WL 5107567, at *4 (W.D.N.Y. Aug. 31, 2020), that exception is plainly inapplicable here.  Such a situation exists when "the medical records . . . show[] relatively minor impairments" that are not "disabling," *Dagonese v. Comm'r of Soc. Sec.*, No. 18-CV-1021-MJR, 2020 WL 3046146, at *4 (W.D.N.Y. June 8, 2020), rather than non-benign, "complex medical findings" that cannot be interpreted by a lay person, *see Dale v. Colvin*, 15-CV-496-FPG, 2016 WL 4098431, at *4 (W.D.N.Y. Aug. 2, 2016).  Here, the record is replete with MRI analyses, radiographies, X-rays, and multiple allegations that Plaintiff was completely unable to work due to radiculopathy, a rotator cuff tear, right shoulder impingement, disc bulges and disc herniations. (R. 350, 517, 658-59, 722-33, 873, 971, 2014, 2053).  Therefore, the ALJ required medical expertise to interpret these complex findings and could not assess the RFC based on "common sense." *See Dale*, 2016 WL 4098431, at *4.

(S.D.N.Y. Feb. 20, 2015).  As the Second Circuit in *Tankisi* explained, where "[t]he medical record . . . is . . . extensive" and contains "sufficient evidence from which an ALJ can assess the petitioner's [RFC]," remand is not required on the grounds that the ALJ failed to request medical opinions in assessing the RFC. *See* 521 F. App'x at 34; *see also Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8–9 (2d Cir. 2017) (finding that RFC determination was proper even though ALJ rejected treating physician's formal medical assessment because she relied on "years' worth of treatment notes" describing claimant's symptoms and assessing characteristics "relevant to her ability to perform sustained gainful activity").  This caveat comports with the general rule that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information." *Rosa*, 168 F.3d at 79 n.5 (quoting *Perez*, 77 F.3d at 48) (internal quotation marks omitted).

**1.  Sufficiency of the Record Before January 11, 2017 Cervical Spine Surgery**

With regard to the years predating Plaintiff's January 11, 2017 cervical spine surgery, the Court disagrees with Plaintiff that further information was required to render an RFC assessment. (Docket No. 30 at 18).  Like the record in *Tankisi*, the medical evidence here is "extensive," containing over 2,000 pages of treatment notes, data, test results and medical reports documenting the ailments Plaintiff suffered following his January 29, 2013 injury at work and their combined impact on his functioning up to his final surgery. *See* 521 F. App'x at 34; *see also Monroe*, 676 F. App'x at 8–9

Moreover, although there are no formal opinions conducting a function-by-function assessment from this period, as noted above, numerous treating physicians provided informal recommendations regarding Plaintiff's physical limitations in their progress notes, which the

ALJ was required to consider in crafting the RFC. *See supra* Section II.D.2.i.  For example, in

2014, Dr. Ng opined that Plaintiff's pain was extensive enough to completely foreclose the

possibility of work. (R. 722, 724, 726, 728, 733).  In 2015, Dr. Moshe opined that Plaintiff

should avoid "all" overhead activities, lifting and carrying five to ten pounds, and sudden neck

movements. (R. 612, 799, 829).  That same year, Dr. Cordiale opined that Plaintiff would require

surgery to fully function, and that for the time being, he was to avoid heavy lifting, carrying and

bending. (R. 333, 336, 339).  In addition, these and numerous other physicians consistently

documented Plaintiff's gait, station, upper extremity strength, grip strength, cervical spine and

right shoulder ranges of motion, tenderness to palpation or muscle spasms in these areas, reflexes

and sensation. (*E.g.*, 338, 516-17, 588, 611, 715, 719-30, 873-75).  The ALJ also had the benefit

of Dr. Revan's consultative findings from June 2016, which concluded that Plaintiff had

moderate limitations "with the right upper extremity for fine and gross motor activity;" mild to

moderate limitations in activities of daily living; mild limitations in walking; and no limitations

in sitting, standing or personal grooming. (R. 2012).  Finally, the independent medical examiners

who evaluated Plaintiff in connection with his workers' compensation claim conducted

musculoskeletal examinations providing further insight into Plaintiff's capabilities. (R. 857, 952,

962, 966, 970-71, 985, 996).

Upon proper application of the treating physician rule, this universe of information will

be sufficient for the ALJ to conduct an RFC analysis. *See Rosa*, 168 F.3d at 79 n.5.  Courts

within this Circuit have found that treatment notes documenting musculoskeletal findings such as

those here, combined with informal assessments of the claimant's restrictions, provide an

adequate basis to conduct the RFC analysis. *See Wright v. Berryhill*, 687 F. App'x 45, 48 (2d

Cir. 2017) (summary order) (finding that RFC for light work with certain restrictions was

supported by substantial evidence because ALJ relied on treatment notes evaluating lumbar tenderness to palpation, spasms, gait and station, extremity strength, sensation to touch, deep tendon reflexes, cervical spine range of motion, manual dexterity and grip strength, as well as treating physician's conclusion that claimant was "unable to perform strenuous activity or return to performing heavy labor"); *Griggs v. Comm'r of Soc. Sec.*, 18-CV-811 (VEC) (OTW), 2019 WL 2453354, at *15 (S.D.N.Y. Feb. 12, 2019), *report and recommendation adopted*, 2019 WL 1284278 (S.D.N.Y. Mar. 20, 2019) ("Although no doctor specifically opined on how long Plaintiff could sit or walk in a workday, the ALJ correctly based his findings on Plaintiff's complete medical history and treatment notes, which, as described above, themselves contain assessments of Plaintiff's musculoskeletal limitations."); *Wilson v. Colvin*, 136 F. Supp. 3d 475, 480 (W.D.N.Y. 2015) (finding that ALJ was not required to request formal RFC assessment from treating physician where physician's notes consistently documented "strength and range of motion relative to [plaintiff's] spine and extremities," "in the context of specifying his work-related limitations").  An ALJ is also equipped to perform this analysis when the record contains examination findings regarding the relevant impairments and one or more consultative medical examination assessing their impact on the claimant's functional capabilities. *See Pellam*, 508 F. App'x at 90; *Bahaga v. Comm'r of Soc. Sec.*, 19 Civ. 05014 (KPF) (RWL), 2020 WL 5755020, at *5 n.6 (S.D.N.Y. July 2, 2020).

Therefore, here, where the record contains a plethora of treatment notes tracing the development of Plaintiff's right shoulder and cervical spine issues over almost four years, in addition to informal functional assessments, a consultative examination, a State agency assessment,[29] and numerous independent medical examinations, there were no gaps requiring the

---

[29] Because State agency physicians and disability examiners are qualified experts in the evaluation of disability claims, an ALJ may properly consider their analysis of a claimant's functional requirements when they are

ALJ to obtain yet another medical opinion regarding Plaintiff's functional capabilities prior to January 2017. *See Pellam*, 508 F. App'x. at 90.  Rather, as discussed *supra*, the ALJ's errors in analyzing this period center on her failure to (1) utilize a function-by-function assessment to explain how the evidence in the record supported the RFC; and (2) properly weigh the opinion evidence. *See supra* Section II.D.

## 2.  Sufficiency of the Record After January 11, 2017 Cervical Spine Surgery

However, the same cannot be said with regard to the period after Plaintiff's January 11, 2017 cervical spine surgery.  There is a dearth of evidence regarding Plaintiff's capacity to engage in exertional activities following that procedure, either in the form of medical opinions or treatment notes.  Indeed, Dr. McCance's January 24, 2017 functional assessment – the only formal medical opinion post-dating the surgery – is not relevant to that determination because it was clearly intended to govern Plaintiff's immediate post-surgery recovery. *See supra* Section D.2.ii; (R. 2021-22).  Excluding that opinion and a contemporaneous treatment note from the same date, (R. 2021-22, 2040), the record is limited to three further treatment notes from January 13, 2017, March 10, 2017, and August 9, 2017 documenting Plaintiff's further recovery from the surgery, (R. 2039, 2042, 2043).

These records are insufficient to render a functional capacity determination because, like Dr. McCance's functional assessment from January 24, 2017, their primary focus is Plaintiff's recovery from surgery and they do not provide enough detail on his ability to return to a work setting.  The January 13, 2017 treatment note – compiled two days after the surgery – documents Plaintiff's arm "feel[ing] better" and a normal gait, but states that a formal examination was not

---

consistent with the record as a whole. *See Marshall v. Astrue*, No. 1:11-722, 2012 WL 5866077, at *7 n.10 (N.D.N.Y. Oct. 18, 2012), *report and recommendation adopted*, 2012 WL 5866516 (N.D.N.Y. Nov. 19, 2012); *see also Wells v. Comm'r of Soc. Sec.*, 338 F. App'x 64, 66 (2d Cir. 2009) (summary order).

performed and describes post-operative procedures, such as removing Plaintiff's drain. (R. 2039). On March 10, 2017, Dr. McCance noted improved numbness in Plaintiff's arm, but continued right paracervical and trapezial pain and unspecified "right shoulder issues." (R. 2042). The treatment note reflects that Plaintiff was "60% better," but it is unclear whether that description reflects Plaintiff or Dr. McCance's assessment. (*Id.*). Dr. McCance also noted that Plaintiff's posterior cervical incision had healed. (*Id.*). On examination, Plaintiff demonstrated a "normal gait pattern," "normal" upper extremity motor and neurological results, and a "limited" cervical range of motion "in all planes." (*Id.*). However, there is no assessment of Plaintiff's right shoulder range of motion, even though Dr. McCance and other physicians evaluated it at previous appointments. (*E.g.*, R. 2035). The last treatment note in the record, from August 9, 2017, reflects that Plaintiff was only "50% better," with continued posterior neck pain, no upper extremity numbness, paresthesias or weakness, and difficulty standing for more than sixty to ninety minutes as well as walking for more than eight blocks. (R. 2043). On examination, Plaintiff again demonstrated a normal gait and capacity to walk on his toes and heels, a "functional" cervical range of motion, and normal motor and neurological examination results in both upper extremities. (*Id.*). Dr. McCance again noted that the surgical incision had healed and advised that despite "some mild neck pain," Plaintiff could "return to all normal activities." (*Id.*). There is no indication whether Dr. McCance evaluated Plaintiff's right shoulder range of motion or whether Plaintiff's "right shoulder issues" from the previous appointment were still present. Nor did Dr. McCance define "all normal activities" or specify how Plaintiff's ongoing "mild neck pain" or reported issues with standing and walking would manifest in a work environment.

This gap should have signaled to the ALJ a need to request a functional abilities assessment of Plaintiff from Dr. McCance or a consultative examiner, yet there is no indication

in the record that the ALJ made efforts to obtain one from him or any other medical expert

regarding Plaintiff's condition after the August 9, 2017 appointment. *See Alamo v. Berryhill*, No.

3:18-CV-00210 (JCH), 2019 WL 4164759, at *5 (D. Conn. Sept. 3, 2019); (R. 250-58).[30]

Rather, the ALJ assigned "significant weight" to Dr. McCance's March and August 2017

recommendations, but did not acknowledge the problematic absence of any meaningful

functional assessment in the accompanying treatment notes. (R. 26).  Furthermore, in proceeding

to the RFC determination, the ALJ did not consider the functional effects of Plaintiff's "mild

neck pain" and continuing "right shoulder issues." (R. 23, 26, 2042-43).  Dr. McCance began

treating Plaintiff in September 2016 for chronic arm, shoulder and neck pain related to his right

shoulder injury, herniated discs and disc bulges. (R. 2031-43, 2052).  On January 10, 2017, Dr.

McCance expressly noted that there was a chance that the surgery would *not* resolve Plaintiff's

neck pain, but would primarily address his arm pain and prevent his neuropathy from

"progress[ing]" further. (R. 2038).  Therefore, an assessment from Dr. McCance of the scope of

Plaintiff's work-related capabilities or limitations based on his conditions after his full recovery

from surgery was crucial. *See Alamo*, 2019 WL 4164759, at *6.

For these reasons, "the administrative record before the ALJ" with respect to Plaintiff's

post-surgery functional capabilities was not "sufficiently comprehensive to permit an informed

finding by the ALJ." *See Sanchez*, 2015 WL 736102, at *6 (quoting *Tankisi*, 521 F. App'x at 33–

34) (internal quotation marks omitted).  Unlike the record in *Tankisi*, the post-surgery

documentation is anything but "extensive," *see* 521 F. App'x at 33–34, and offers "no insight

---

[30] The Court notes that Plaintiff contacted the ALJ twice after the hearing in August and September 2018, requesting additional time to supplement the record due to "difficult[ies]" obtaining evidence from certain providers other than Dr. McCance. (R. 288; *see also* R. 285).  On September 24, 2018, the ALJ declined to grant any further extensions and issued a decision without the outstanding records. (R. 289).  Because Plaintiff does not assert that this action constitutes error or that the missing records constitute a "gap," the Court does not address whether these specific records were necessary to ensure a complete record. (*See* Docket No. 30).

into how [Plaintiff's] [ongoing] impairments affect or do not affect [his] ability to work," *see Guillen v. Berryhill*, 697 F. App'x 107, 108–09 (2d Cir. 2017) (summary order).  Although Dr. McCance directed Plaintiff to resume unspecified "normal activities" in August 2017, (R. 2043), this "vague statement[]" is "insufficient to establish" Plaintiff's capacity for light work. *See Martinez v. Colvin*, 15 Civ. 3366 (PGG)(HBP), 2016 WL 11483844, at *20 (S.D.N.Y. Aug. 22, 2016), *report and recommendation adopted*, 2016 WL 5338554 (S.D.N.Y. Sept. 23, 2016); *see also Andrews v. Colvin*, No. 13 Civ. 2217(RWS), 2014 WL 3630668 at *11 (S.D.N.Y. July 22, 2014) ("Insofar as the ALJ Decision was based on Dr. Philip's assessment of Plaintiff's limitations, the ALJ erred in relying on the doctor's vague, non-specified notes regarding Plaintiff's ability to squat, lift, carry, push and pull.").  This is especially so given that the accompanying treatment note does not shed light on the extent to which Dr. McCance examined Plaintiff's right shoulder, and he previously warned that the surgery may not eliminate Plaintiff's neuropathy or neck pain. (R. 2038).

Therefore, the ALJ is directed to seek a more fulsome medical source statement from Dr. McCance, including an assessment of Plaintiff's limitations with regard to his ability to work, as well as allow Plaintiff to supplement the record with any additional relevant medical documentation regarding his functional status post surgery. *See Guillen*, 697 F. App'x at 109.  If the ALJ cannot obtain such a statement, or the ALJ believes it is insufficient to render a functional capacity determination, the ALJ may order an additional consultative examination and request further information as she sees fit in light of any supplemental records. *See* 20 C.F.R. § 404.1520b(b) (noting that agency "may" order a consultative examination or "request additional existing evidence" to remedy an incomplete record); *see also Lobaido v. Saul*, 19-CV-340 (PKC), 2020 WL 1550584, at *5 (E.D.N.Y. Mar. 31, 2020).  The ALJ is also instructed to

reassess Plaintiff's credibility and RFC in light of any new information, and, "if warranted . . . , obtain evidence from a [VE] to clarify the effect of the assessed limitations on [Plaintiff's] occupational choices." *See Guillen*, 697 F. App'x at 109.

## F. English Language Skills

Plaintiff finally alleges that the ALJ erred in finding that he had the requisite language skills to find work in the national economy. (Docket No. 30 at 19-20).  According to Plaintiff, there is insufficient evidence to demonstrate that he can perform the jobs recommended by the VE because he cannot read, speak or write in English and the ALJ's hypotheticals to the VE did not account for these deficits. (*Id.*).  The Commissioner responds that although Plaintiff may have interpreted the record differently than the ALJ, the ALJ's determination must be upheld because it is supported by substantial evidence, and the ALJ "specifically inquired about this issue at the . . . hearing." (Docket No. 32 at 27-28).  The Court finds that although Plaintiff's language deficiencies are well-documented, there is sufficient evidence to demonstrate that he could perform the jobs recommended by the VE, to the extent that they involved Language Level 1, the most basic Language Level in the Dictionary of Occupational Titles ("D.O.T.").  Although any new RFC findings on remand will require further VE testimony regarding Plaintiff's employability, *see supra* Section II.E.2, the Court provides the following guidance with regard to to Plaintiff's English language capabilities.

Language skills are evaluated as a vocational factor of education at step five of the sequential evaluation. *See Yulfo-Reyes v. Berryhill*, No. 3:17CV02015(SALM), 2018 WL 5840030, at *10 (D. Conn. Nov. 8, 2018).  Although the claimant has the general burden to prove he or she has a disability under the definitions of the Social Security Act, the burden shifts to the Commissioner at step five "to show there is other work that [the claimant] can perform."

*McIntyre*, 758 F.3d at 150 (quoting *Brault*, 683 F.3d at 445) (internal quotation marks omitted). "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion' [and] . . . [the hypothetical] accurately reflect[s] the limitations and capabilities of the claimant involved." *Id.* at 151 (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983)). "If a hypothetical does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a VE's response cannot constitute substantial evidence to support a finding of no disability." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 211 (W.D.N.Y. 2009).

The regulations separate language skills into two components: literacy and communication. *See Yulfo-Reyes*, 2018 WL 5840030, at *10 (citing 20 C.F.R. § 416.964 (2020)).[31]   Whereas "illiteracy" is defined as the "inability to read or write," the "inability to communicate in English is a separate educational factor that the SSA may consider." *See Afari v. Berryhill*, No. 16-CV-595-FPG, 2017 WL 1963583, at *3 (W.D.N.Y. May 12, 2017) (quoting 20 C.F.R. § 416.964(b)(1), (5)) (internal quotation marks omitted).   A person is classified as illiterate "if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." 20 C.F.R. § 416.964(b)(1).   As to the ability to communicate in English, the regulations state: "Since the ability to speak, read and

---

[31] The Social Security Administration has updated its rules to remove "inability to communicate in English" as an education category for cases filed from April 27, 2020 forward. *See* Removing Inability To Communicate in English as an Education Category, 85 Fed. Reg. 10586-01 (Feb. 25, 2020).  However, "inability to communicate in English" remains the correct standard here, as the ALJ rendered her decision on October 3, 2018, (R. 18-28), and courts within this Circuit traditionally apply the version of the rules in effect "when the ALJ adjudicated [the subject] disability claim." *See Lowry*, 474 F. App'x at 804 n.2 (summary order); *see also Estrada v. Comm'r of Soc. Sec.*, No. 18-cv-3530(KAM), 2020 WL 3430680, at *7 n.1 (E.D.N.Y. June 23, 2020).

understand English is generally learned or increased at school, we may consider this an educational factor." *Id.* § 416.964(b)(5).

Consistent with the D.O.T., the VE testified that all three jobs that would accommodate Plaintiff's RFC require Level 1[32] English skills, the lowest of six language levels. (R. 57); *208.685-014 Folding-Machine Operator*, Dictionary of Occupational Titles, 1991 WL 671754; *525.687-014 Casing Splitter*, *id.*, 1991 WL 674441; *520.686-014 Dessert-Cup-Machine Feeder*, *id.*, 1991 WL 674042; Appendix C – Components of the Definition Trailer, *id.*, 1991 WL 688702.  Level 1 requires a combination of basic reading, writing and speaking. *See* Appendix C – Components of the Definition Trailer, *id.*, 1991 WL 688702.[33]  Although not stated in the D.O.T., courts have noted that Language Level 1 corresponds with a third grade reading level. *See Slack v. Colvin*, No. 1:14-CV-00200 (MAT), 2016 WL 556358, at *4 (W.D.N.Y. Feb. 12, 2016); *Matthews v. Comm'r of Soc. Sec.*, No. 1:13–cv–195, 2014 WL 5392991, at *9 (D. Vt. Oct. 23, 2014).

---

[32] Each job description in the D.O.T. includes General Educational Development ("GED") levels rated between "1" and "6" pertaining to reasoning, mathematical and language development. *See* Appendix C–Components of the Definitional Trailer, Dictionary of Occupational Titles, 1991 WL 688702 (4th ed. 1991).  The GED levels "describe the general educational background that makes an individual suitable for a particular job." *Vandermark v. Colvin*, No. 3:13-cv-1467 (GLS/ESH), 2015 WL 1097391, at *9 n.19 (N.D.N.Y. Mar. 11, 2015).

[33] Specifically, it involves:

> Reading: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.

> Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

> Speaking: Speak simple sentences, using normal word order, and present and past tenses.

*Id.*

Here, although there is conflicting evidence regarding Plaintiff's language abilities, there is enough to support the ALJ's finding that he could communicate in English. *See Schaal*, 134 F.3d at 504 ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record.").  On the one hand, Plaintiff received most of his education in the Dominical Republic, followed by three years of schooling in the United States up to the eleventh grade. (R. 46).  He testified that he could "write" and "speak a little bit" of English, but emphasized that "in order to understand both writing and in English," he had "very, very little" ability. (R. 55).  He also testified with the assistance of an interpreter at the hearing, (R. 36), and utilized interpreters at his medical appointments, (*e.g.*, R. 951).  Likewise, Plaintiff's Disability Report stated that he could not speak, read, understand or write more than his name in English. (R. 227).

On the other hand, during the hearing, Plaintiff responded to a question in Spanish before waiting for it to be translated by the interpreter, demonstrating his ability to understand spoken English. (*See* R. 36-27).  Plaintiff's Function Report contained full handwritten sentences in English, and Plaintiff indicated that he completed it on his own. (R. 238-245).  Plaintiff also testified that he worked as a grocery store stock clerk, followed by a construction laborer, until his work accident in 2013. (R. 44-45).

In her decision, the ALJ found that Plaintiff had a "limited education," but was "able to communicate in English," and therefore employable based on the VE's opinion. (R. 27-28).  She also noted Plaintiff's prior work and determined that, in light of Plaintiff's "presentation at the hearing," Plaintiff's assertion that he was unable to understand English was not credible. (*See id.*).  In addition, after listening to Plaintiff's testimony regarding his education and language abilities, the VE classified Plaintiff's past positions as a grocery stock clerk, requiring semi-skilled work with an SVP level of four, and a construction laborer, requiring unskilled work with

an SVP level of two, at codes 299.367-014 and 869.687-026 in the D.O.T., respectively. (R. 55-56).  She further testified that although a hypothetical individual with Plaintiff's RFC and educational background could no longer perform those jobs, such an individual could work as a dessert cup machine feeder, folding machine operator and casing splitter. (R. 56-57).  She asserted that the hypothetical individual could maintain these jobs even if he or she required instruction by demonstration. (R. 57-58).

The Court recognizes that Plaintiff's English skills may be rudimentary, but finds on this record that there is substantial evidence to support the ALJ's determination. *See Brault*, 683 F.3d at 448 ("Under the substantial evidence standard, a reviewing court may reject an ALJ's findings of fact only if a reasonable factfinder would *have to conclude otherwise*.") (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis in original) (internal quotation marks omitted).  An ALJ's decision is sufficient where, as here, it is clear from the ALJ's written determination that the ALJ considered conflicting evidence, but simply did not draw the conclusions that Plaintiff thinks she should have. *See Pulos v. Comm'r of Soc. Sec.*, 346 F. Supp. 3d 352, 360–62 (W.D.N.Y. 2018).  In addition, "the standard for literacy [is] . . . low" and "the question is only whether the plaintiff is so deficient in his ability to read and write that he cannot obtain even an unskilled job." *Gross v. McMahon*, 473 F. Supp. 2d 384, 388–89 (W.D.N.Y. 2007) (quoting *Glenn v. Sec'y of Health and Hum. Servs.*, 814 F.2d 387, 391 (7th Cir. 1987)) (internal quotation marks omitted).

"Because the Commissioner relied on [VE] testimony to establish that [Plaintiff is employable], the relevant question is whether the hypotheticals posed to the VE were [infected] by an erroneous description of [P]laintiff's educational history and/or literacy level, such that the Commissioner failed to meet his burden to show that there are jobs . . . in the national economy

that [P]laintiff can perform." *See Ruiz v. Saul*, 18-CV-6404L, 2020 WL 57197, at *2 (W.D.N.Y. Jan. 3, 2020); *see also McIntyre*, 758 F.3d at 150.  However, Plaintiff has not identified any aspect of the hypothetical posed to the VE or his testimony that was factually incorrect with regard to Plaintiff's language skills. (*See generally* Docket No. 30 at 19-20).  Moreover, Plaintiff's counsel did not question the VE regarding Plaintiff's ability to work in light of any language deficits. (R. 58-61).  Therefore, the hypothetical was based on substantial evidence, even though it did not expressly include Plaintiff's language capabilities. *See Ruiz*, 2020 WL 57197, at *2–3 (finding that any error in categorizing plaintiff of a "limited education" rather than "illiterate" was harmless where hypothetical inquired as to a person with plaintiff's "education" and VE was present when plaintiff testified to completing school through eleventh grade in Puerto Rico and that he had difficulty reading and writing in English); *Dorn v. Berryhill*, 16-CV-6635 (JWF), 2018 WL 3321564, at *2 (W.D.N.Y. July 5, 2018) (finding that substantial evidence supported determination that claimant could perform jobs at Language Level 1 though hypothetical did not mention limited reading abilities, where counsel failed to cross-examine the VE regarding reading skills and VE testified that she took language skills into account).

In addition, even if the hypothetical was faulty, there is substantial evidence to demonstrate that Plaintiff can perform work with Level 1 language skills while having a "limited education," or even while being illiterate. *See Galarza v. Berryhill*, No. 3:18CV00126(SALM), 2019 WL 525291, at *14–17 (D. Conn. Feb. 11, 2019).  The regulations define "limited education" as "a 7th grade through the 11th grade level of formal education," but note that "the numerical grade level that [a claimant] completed in school may not represent [his or her] actual education abilities." 20 C.F.R. § 416.964(b)(3).  Plaintiff completed the eleventh grade in the United States, filled out the entire Function Report by himself, and successfully worked stocking

groceries and in demolition until 2013. *See Jimenez v. Berryhill*, No. 16-CV-3972, 2018 WL 4054876, at \*6 (E.D.N.Y. Aug. 24, 2018) (finding that ALJ properly found claimant had "limited" education with fourth grade education, as he completed his own function report in English and worked as a restaurant chef).  Courts have found that whether deemed illiterate or of a "limited education," claimants with backgrounds like Plaintiff's can perform work at Language Level 1. *See Ruiz*, 2020 WL 57197, at \*2–3 (finding that claimant who completed eleventh grade in special education with limited English capacity could perform hand packager job); *Galarza*, 2019 WL 525291, at \*15–17 (finding "illiterate" claimant employable because record evidenced some ability to read and write more than his name in English and he previously worked in jobs at Language Levels 1 and 2).[34]  The VE classified Plaintiff's stock clerk job as 299.367-014 in the D.O.T., which requires a Language Level of 2. *299.367-014 Stock Clerk*, Dictionary of Occupational Titles, 1991 WL 672631; (R. 56).  She also classified Plaintiff's construction job as 869.687-026 in the D.O.T., which requires a Language Level of 1. *869.687-026 Construction Worker II*, Dictionary of Occupational Titles, 1991 WL 687635; (R. 55).  Therefore, contrary to Plaintiff's assertions, the record "demonstrate[s] some facility with the English language" at Levels 1 *or* 2 – namely, at or even above the level to which Plaintiff objects – including an ability to read, follow instructions, and write more than his name in English. *See Galarza*, 2019 WL 525291, at \*15–17.

Accordingly, regardless of the terminology used to describe Plaintiff's language skills, there is sufficient evidence on this record to support a finding that he had the linguistic ability to engage in the three jobs recommended by the VE.  Therefore, the Court finds that the ALJ's step

---

[34] *See also Ward v. Comm'r of Soc. Sec.*, 5:16-CV-1038 (GTS)(WBC), 2017 WL 7049561, at \*7 (N.D.N.Y. Nov. 16, 2017), *report and recommendation adopted*, 2018 WL 546951 (N.D.N.Y. Jan. 16, 2018); *920.587-018 Hand Packager*, Dictionary of Occupational Titles, 1991 WL 687916.

five determination with regard to Plaintiff's language skills was supported by substantial

evidence.

## III.  CONCLUSION

For the foregoing reasons, Plaintiff's motion is granted in part and denied in part,

Defendant's cross-motion is granted in part and denied in part, and this case is remanded to the

Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent

with this Opinion & Order.  The Clerk of the Court is respectfully requested to terminate the

pending motions (Docket Nos. 29 and 31), and close the case.

Dated:    March 15, 2021
              White Plains, New York

                                    **SO ORDERED:**


                                    _____
                                    JUDITH C. McCARTHY
                                    United States Magistrate Judge